**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **DONDERRIOUS WILLIAMS,** | Case No.: |
| **Plaintiff,** | |
| **v.** | **COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF** |
| **JEREMY PELZER, MICHAEL JONES, STEVEN PARKER, CHRISTOPHER COTTLES, C. ALLEN, F. ALLEN, THOMAS HINES, JASON KETTLEMAN, DEMETRIUS CHARLEY, C. SIMPSON, LUTHER SMITH, DEBORAH TONEY, CHADWICK CRABTREE, WILLIAM STREETER, JOHN HAMM, EDWARD ELLINGTON, DOES 1-10.** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

## I.     INTRODUCTION

Plaintiff Donderrious Williams was incarcerated by the Alabama Department of Corrections ("ADOC") at Limestone Correctional Facility ("Limestone") during the time of the events at issue in this Complaint.  He was known to the Defendants as an observant Muslim and a leader in the prison's Black community.  Over the nearly three years he was incarcerated at Limestone, the Defendants committed multiple violations of Mr. Williams's clearly established federal constitutional rights.  Among other things, they repeatedly subjected Mr. Williams to racist and anti-Muslim comments; committed him to disciplinary segregation without due process, based on false and unsupported charges of conspiring with his post-conviction counsel to introduce contraband into the facility; and battered and pepper-sprayed him for peacefully resisting a haircut that he objected to on religious grounds.  Accordingly, Mr. Williams brings this lawsuit pursuant to 42 U.S.C. § 1983 for retaliating against him for engaging in protected speech, in violation of the First Amendment to the United States Constitution; interfering with his free exercise of his religion, also in violation of the First Amendment; limiting his right of access to counsel and the courts, in violation of the First, Sixth, and Fourteenth Amendments; subjecting him to cruel and unusual punishment and excessive force, in violation of the Eighth and Fourteenth Amendments; and discriminating against him on the basis of his race and interfering with his right to procedural due process, in violation of the Fourteenth Amendment.

In further support of his Complaint, Mr. Williams states:

## II.     THE PARTIES

1.      **Plaintiff Donderrious Williams** is a Black man, a poet, a father, a grandfather, and a former minister.  Mr. Williams has been incarcerated by the ADOC since 2007.  He was at Limestone in Harvest, Alabama, for approximately three years between December 2018 and October 2022.  He is currently incarcerated at Donaldson Correctional Facility ("Donaldson") in Bessemer, Alabama. His Alabama Institutional Serial number is 251429.

2.      **Defendant Jeremy Pelzer** is or was a Correctional Lieutenant at Limestone.  Upon information and belief, Defendant Pelzer is a resident of Alabama.  As a Lieutenant, Defendant

Pelzer is responsible for ensuring the safety and security of incarcerated people and the supervision of all subordinate employees.  Defendant Pelzer is sued in his individual capacity.

3.      **Defendant Michael Jones** is or was a Correctional Lieutenant at Limestone.  Upon information and belief, Defendant Jones is a resident of Alabama.  As a Lieutenant, Defendant Jones is responsible for ensuring the safety and security of incarcerated people and the supervision of all subordinate employees.  Defendant Jones is sued in his individual capacity.

4.      **Defendant Steven Parker** is or was a Correctional Sergeant at Limestone. Upon information and belief, Defendant Parker is a resident of Alabama.  As a Sergeant, Defendant Parker is responsible for ensuring the safety and security of incarcerated people and the supervision of all subordinate employees.  Defendant Parker is sued in his individual capacity.

5.      **Defendant Christopher Cottles** is or was a Correctional Sergeant at Limestone. Upon information and belief, Defendant Cottles is a resident of Alabama.  As a Sergeant, Defendant Cottles is responsible for ensuring the safety and security of incarcerated people and the supervision of all subordinate employees.  Defendant Cottles is sued in his individual capacity.

6.      **Defendant C. Simpson** is or was a Correctional Sergeant at Limestone.  Upon information and belief, Defendant Simpson is a resident of Alabama.  As a Sergeant, Defendant Simpson is responsible for ensuring the safety and security of incarcerated people and the supervision of all subordinate employees.  Defendant Simpson is sued in his individual capacity.

7.      **Defendant Luther Smith** is or was a Correctional Sergeant at Limestone.  Upon information and belief, Defendant Smith is a resident of Alabama.  As a Sergeant, Defendant Simpson is responsible for ensuring the safety and security of incarcerated people and the supervision of all subordinate employees.  Defendant Smith is sued in his individual capacity.

8.      **Defendant C. Allen** is or was a Correctional Officer at Limestone. Upon information and belief, Defendant C. Allen is a resident of Alabama.  As a Correctional Officer, Defendant C. Allen is responsible for ensuring the safety and security of incarcerated people. Defendant C. Allen is sued in his individual capacity.

9.     **Defendant F. Allen** is or was a Correctional Officer at Limestone.   Upon information and belief, Defendant F. Allen is a resident of Alabama.  As a Correctional Officer, Defendant F. Allen is responsible for ensuring the safety and security of incarcerated people. Defendant F. Allen is sued in his individual capacity.

10.    **Defendant Thomas Hines** is or was a Correctional Officer at Limestone.  Upon information and belief, Defendant Hines is a resident of Alabama.  As a Correctional Officer, Defendant Hines is responsible for ensuring the safety and security of incarcerated people. Defendant Hines is sued in his individual capacity.

11.    **Defendant Jason Kettleman** is or was a Correctional Officer at Limestone.  Upon information and belief, Defendant Kettleman is a resident of Alabama.  As a Correctional Officer, Defendant Kettleman is responsible for ensuring the safety and security of incarcerated people. Defendant Kettleman is sued in his individual capacity.

12.    **Defendant Demetrius Charley** is or was a Correctional Officer at Limestone. Upon information and belief, Defendant Charley is a resident of Alabama.  As a Correctional Officer, Defendant Allen is responsible for ensuring the safety and security of incarcerated people. Defendant Charley is sued in his individual and official capacities.

13.    **Defendant Deborah Toney** was a Warden at Limestone.  Upon information and belief, Defendant Toney is a resident of Alabama.  As Warden, Defendant Toney was responsible for the day-to-day operations at the prison, the approval of disciplinary charges, the safety of all incarcerated people at Limestone, and the supervision of all subordinate employees.  Defendant Toney is sued in her individual capacity.

14.    **Defendant Chadwick Crabtree** is a Warden at Limestone.  Upon information and belief, Defendant Crabtree is a resident of Alabama.   As Warden, Defendant Crabtree is responsible for the day-to-day operations of the prison, the approval of disciplinary charges, the safety of all incarcerated people at Limestone, and the supervision of all subordinate employees. Defendant Crabtree is sued in his individual and official capacities.

15.     **Defendant William Streeter** is a Warden at Limestone.  Upon information and belief, Defendant Streeter is a resident of Alabama.  As Warden, Defendant Streeter is responsible for the day-to-day operations of the prison, the approval of disciplinary charges, the safety of all incarcerated people at Limestone, and the supervision of all subordinate employees.  Defendant Streeter is sued in his individual and official capacities.

16.     **Defendant Edward Ellington** is the Correctional Institutional Coordinator responsible for the ADOC's Northern Region, which includes Limestone.  As Institutional Coordinator, Defendant Ellington is responsible for supervising the wardens at Limestone, ensuring the safety and security of incarcerated people within his region, and supervising and creating policies and procedures that govern the institutions he oversees, including Limestone. Upon information and belief, Defendant Ellington is notified of each instance of use of force by officers.  At all relevant times, Defendant Ellington has acted under color of state law.  Defendant Ellington is sued in his individual and official capacities.

17.     **Defendant John Hamm** has served as the Commissioner of the ADOC since January 1, 2022.  Defendant Hamm is a resident the Middle District of Alabama.  As Commissioner, Defendant Hamm is responsible for heading the ADOC, for the independent direction, supervision, and control of the ADOC, and for approving and issuing administrative regulations and changes. *See* Ala. Code. § 14-1-1.3.  Defendant Hamm is responsible for providing constitutional conditions of confinement in all facilities.  At all relevant times, Defendant Hamm has acted under color of state law.  Defendant Hamm is sued in his individual and official capacities.

18.     **Defendants Does 1-10** are or were Correctional Officers, Sergeants, Lieutenants, Captains, Wardens, or other employees of the ADOC.  Defendants Does 1-10 are sued under aliases because their identities are currently unknown to Plaintiff.  Upon information and belief, Defendant Does 1-10 are residents of Alabama.  Defendants Does 1-10 are sued in their individual capacities.

III.    **JURISDICTION**

19.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

20.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because at least one defendant resides in this judicial district, and all defendants are residents of Alabama.

IV.    **FACTUAL BACKGROUND**

A.    **Donderrious Williams's Background**

21.    Mr. Williams is a Black man from Birmingham, Alabama.  He is a father of two and a grandfather of one, a poet, and a former athlete.  Mr. Williams is also a former Islamic minister who has helped many people turn their lives around in prison through religious study and faith.  Mr. Williams is proud of his cultural identity as a Black man; is aware of his rights, including his rights to be free from cruel and unusual punishment and to freely exercise his religion; and believes strongly in maintaining the markers of his spiritual identity, including hair that he wears long as a proof of his religious devotion.

22.    Mr. Williams was convicted of a crime occurring shortly after his twentieth birthday.  The ADOC has incarcerated Mr. Williams since 2007.  He is currently incarcerated at Donaldson in Bessemer, Alabama.

23.    During his term of incarceration, Mr. Williams has become a leader in the Black and Muslim communities within the ADOC.  He has consistently worked to educate and empower incarcerated individuals, especially Black men and other marginalized people.  ADOC officials, including Defendants, have targeted Mr. Williams specifically because of his advocacy efforts.  Throughout his time incarcerated by the ADOC, Mr. Williams has been subjected to racist and anti-Muslim comments, violence, harassment, and a variety of other violations of his state and federal rights, as discussed in detail below.

**B.      The ADOC and Limestone Have a History of Constitutional Violations**

24.      The ADOC has a long and well-documented history of subjecting incarcerated people to unconstitutional conditions. *See, e.g., Hope v. Pelzer,*[1] 536 U.S. 730 (2002) (denying qualified immunity to ADOC officers for their cruel and unusual punishment of an incarcerated person, including twice handcuffing the incarcerated person to a hitching post in extreme temperatures for hours at a time); *Braggs v. Dunn,* 257 F. Supp. 3d 1171, 1267 (M.D. Ala. 2017) (finding that the "ADOC's mental-health care is horrendously inadequate" in part due to the ADOC's practice of "imposing disciplinary sanctions on mentally ill prisoners for symptoms of their mental illness, and imposing disciplinary sanctions without regard for the impact of sanctions on prisoners' mental health").

25.      The severe and systemic nature of unconstitutional conditions within the ADOC prompted a recent, multi-year investigation by the United States Department of Justice ("DOJ"), culminating in the DOJ issuing two landmark reports detailing its reasonable cause to believe that the prison conditions faced by male incarcerated people in Alabama violate the Eighth Amendment's prohibition on cruel and unusual punishment.

26.      The first of these reports, issued in April 2019, the year after Mr. Williams's transfer to Limestone, detailed "the contributing factors to the overall unconstitutional condition of ADOC prisons," resulting in a culture in which the ADOC routinely failed to provide incarcerated people with safe living conditions or protect them from violence and abuse caused by other incarcerated people.[2]  The report also stated DOJ's view that ADOC officials demonstrated deliberate indifference to the substantial risk of serious harm posed to people incarcerated in ADOC facilities resulting from these unconstitutional conditions.

---

[1] Respondent Mark Pelzer in *Hope v. Pelzer* is not Defendant Jeremy Pelzer.  Defendant Jeremy Pelzer is believed to be Mark Pelzer's son.
[2] *See* Exhibit 1, *Investigation of Alabama's State Prisons for Men*, United States Department of Justice, Civil Rights Division (April 2, 2019), available at https://www.justice.gov/opa/press-release/file/1150276/download.

27.     In July 2020, the DOJ issued a second report addressing the ADOC's failure to protect incarcerated people from ADOC officers' rampant use of excessive force.[3]

28.     In its 2020 report, the DOJ found that corrections officers exhibited widespread use of excessive force against incarcerated men.  The report further found that the use of excessive force occurred "pursuant to a pattern or practice of resistance to the full enjoyment of rights [of the incarcerated people] protected by the Eighth Amendment."  The 2020 report found that ADOC officers "frequently use excessive force on prisoners" in 12 of 13 Alabama prisons, including Limestone, "giv[ing] rise to systemic unconstitutional conditions" throughout the prison system. The uses of excessive force the DOJ identified included "the use of batons, chemical spray, and physical altercations" that "often result in serious injuries and, sometimes, death."  All too often, the DOJ found, these uses of force were committed "in the absence of a physical threat" while the officers involved made "no effort to de-escalate tense situations."

29.     The DOJ found that ADOC correctional officers often used excessive force on incarcerated people who were already handcuffed or who did not otherwise pose a physical threat, including by striking these incarcerated people with their hands, fists, feet, and batons, and spraying them with chemical spray.

30.     The DOJ found that ADOC correctional officers frequently use chemical spray "inappropriately. Prisoners who do not present a danger are frequently sprayed with chemical agents.  In those cases, officers seem to punish prisoners for not complying with a verbal order." Such use of chemical spray is directly contrary to ADOC regulations directing that the use of chemical spray must only be resorted to when an incarcerated person cannot be controlled through other, less violent, methods.  The DOJ found that "chemical spray is regularly used as retribution" in ADOC facilities, in violation of the federal Constitution.

---

[3] *See* Exhibit 2, *Investigation of Alabama's State Prisons for Men*, United States Department of Justice, Civil Rights Division (July 30, 2020), available at https://www.justice.gov/crt/case-document/file/1297031/download.

31.     The DOJ also found that ADOC officers "often use force to punish prisoners when the prisoner's response or behavior may not accord with the officer's commands, even though the prisoner does not physically resist or present a reasonably perceived threat to others."  The DOJ found it "common" for officers to strike incarcerated men "with little justification[,] as a form of punishment," and observed that "[a]t times, officers are even more forceful [than that]."

32.     The DOJ's 2020 report found that many incidents of excessive force were "unreported or underreported" within the ADOC or were wrongly determined by ADOC investigators to be "unsubstantiated[,] . . . despite the absence of critical information in investigative files."

33.     The report further described a lack of accountability in the ADOC's procedures for reviewing uses of force.  Specifically, the report noted that ADOC correctional officers regularly failed to report or document their uses of force; that officers' uses of force were "frequently not investigated" by the ADOC's investigatory division, or that investigations that did occur were "frequently inadequate"; that officers' use of force was frequently unaddressed; and that there was little evidence of resulting discipline.  The result of this lack of accountability was "a culture where unlawful uses of force are common."

34.     The 2020 report concluded that unlawful incidents of excessive force and the underreporting of those incidents would "likely continue to occur until such time as the conditions within Alabama's prisons are affirmatively addressed."

35.     On December 9, 2020, the DOJ formally sued the State of Alabama and the ADOC for violating the Eighth and Fourteenth Amendment rights of the men entrusted to its care.  In its complaint, the DOJ alleged that since its 2019 report, incarcerated men in Alabama "have continued daily to endure a high risk of death, physical violence, and sexual abuse," and that "the United States has determined that constitutional compliance cannot be secured by voluntary means."  The case is set for trial in 2024.

36.     Conditions for people incarcerated within the ADOC, particularly for people of color, have not improved in the years since the DOJ published its reports.[4]  The conditions have caused people incarcerated by the ADOC, especially those in segregation, to suffer from high rates of suicide.[5]

37.     Indeed, concomitant with the ongoing pattern of constitutional violations occurring within the ADOC, the racial dimensions of the United States' mass incarceration crisis are, and have been, particularly glaring in Alabama.  Fifty-six percent of people in Alabama prisons are Black, although only twenty-seven percent of the State's general population is Black.[6]

38.     Defendants are aware of these ongoing issues. Defendant Hamm receives information about litigation involving the ADOC, including each of the aforementioned active cases.  Defendants Hamm, Ellington, Crabtree, and Streeter receive reports and updates about the inadequate mental health and security conditions at Limestone in the normal course of their duties.  Defendants Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Kettleman, Charley, Smith, and Simpson have been personally involved in the use of excessive force against incarcerated people, and they have specifically targeted Black men for excessive force and retaliation.

39.     Nonetheless, Defendants have failed to take action to redress these well-known issues, and conditions have remained the same or in some cases worsened.

**C.     Lieutenant Pelzer Targeted Mr. Williams for Harassment and Retaliation Because He is Black**

40.     In December 2018, Mr. Williams was transferred to Limestone.   When Mr. Williams arrived at the facility, Defendant Pelzer approached him and asked, "Are you in a gang?"

---

[4] *See*, *e.g.*, Carla Crowder & Eddie Burkhalter, *Four Years After the U.S. Department of Justice Warning, Alabama's Prisons Have Only Gotten Worse*, Alabama Appleseed Center for Law and Justice (April 3, 2023), available at https://alabamaappleseed.org/alabama-prisons/four-years-after-the-u-s-department-of-justice-warning-alabamas-prisons-have-only-gotten-worse/.

[5] *See, e.g.*, *id.*; *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1220 (M.D. Ala. 2017) (noting that the ADOC's suicide rate was more than double the national average).

[6] Alabama Appleseed Center for Law and Justice, *Mass Incarceration and Unconstitutional Prisons* (last accessed June 27, 2023), available at https://www.alabamaappleseed.org/mass-incarceration/.

Mr. Williams responded with a comment to the effect of, "No, why I got to be in a gang?" Defendant Pelzer replied, "Because you're Black."

41.    Desiring to assert his dignity and express his pride in his cultural heritage, Mr. Williams responded to Defendant Pelzer, "Are you in the Klan?"

42.    Mr. Williams's assertive response to Defendant Pelzer's racist accusation made apparent to Defendant Pelzer that Mr. Williams was someone who would stand up to discriminatory conduct and mistreatment of incarcerated individuals.

43.    After this initial interaction, and as described fully below, Defendant Pelzer and other defendants repeatedly subjected Mr. Williams to race- and religion-based verbal abuse, harassment, and unjustified violent force, as well as extended and unjustified confinement in Limestone's administrative segregation, which continued throughout Mr. Williams's period of incarceration at Limestone.

**D.    Limestone Officers Locked Mr. Williams In an Outdoor Holding Cell In Frigid Temperatures**

44.    On March 5, 2021, Mr. Williams's cellmate, in a state of drunken confusion, attacked Mr. Williams in their cell.  There were no correctional officers nearby, so Mr. Williams was forced to stop his cellmate's attack himself.  Mr. Williams was able to de-escalate the situation but not before his inebriated cellmate fell, resulting in a cut to Mr. Williams's cellmate's arm.

45.    Mr. Williams rendered first aid to his cellmate for the arm injury and they went together to the medical unit for additional medical attention.

46.    Despite Mr. Williams's cellmate's description of the altercation, Defendant Jones took Mr. Williams, who was dressed only in a t-shirt and thin pants, to an outdoor holding cell. Defendant Jones left Mr. Williams locked in the outdoor holding cell outside for over an hour, rendering Mr. Williams so cold he was unable to speak.  Mr. Williams asked Defendant Jones to let him inside because he was so cold and because he needed to use the bathroom.  Defendant Jones refused.

### E. Limestone Officers Sentenced Mr. Williams to Disciplinary Segregation Without Due Process

47.     After this incident, Mr. Williams's cellmate stated multiple times that Mr. Williams was not to blame for the injury.  Because no officers were nearby, Mr. Williams and his cellmate were the only people who witnessed the injury.  Despite lacking the requisite evidence, Defendant Pelzer charged Mr. Williams with two rules violations.

48.     ADOC Administrative Regulation ("AR") 403 requires that, at rules violation hearings, a Hearing Officer be appointed who was not involved in the investigation of the incident.[7]

49.     Defendant Jones, who had been directly involved in addressing the aftermath of the incident with Mr. Williams's cellmate, nevertheless served as Mr. Williams's Hearing Officer.

50.     AR 403 also requires that at rules violations hearings, incarcerated people "must be permitted to call witnesses."[8]

51.     Mr. Williams requested to call his cellmate as a witness.  Defendant Jones, however, refused this request.

52.     AR 403 also requires that any disciplinary hearing is held within ten working days from the service of the disciplinary report, absent certain exceptions not applicable in Mr. Williams's case.[9]

53.     Mr. Williams's disciplinary hearing, however, was held on April 6, 2021, more than ten working days after the service of his disciplinary report on March 15, 2021.

54.     During the hearing, Defendant Jones relied entirely on Defendant Pelzer's uncorroborated testimony to find Mr. Williams guilty.  Based on his finding of guilt, Defendant Jones sentenced Mr. Williams to disciplinary segregation.

55.     As a result of the due process violations during Mr. Williams's disciplinary hearing, as well as further wrongdoing discussed below, Mr. Williams remained in segregation for approximately 591 days.

---

[7] *See* ADOC Administrative Regulation ("AR") 403(V)(A)(2)(b).
[8] *Id.* at 403(V)(A)(7)(d).
[9] *Id.* at 403(V)(B)(1)(A).

56.     Mr. Williams was classified as "close custody," the most restrictive custody level, for nearly all of his time in disciplinary segregation.  During this time, Mr. Williams was confined to a six foot by nine foot cell for an average of approximately 23 hours and 56 minutes per day; could only participate in one educational program; could not exercise without being shackled and having his hands cuffed behind his back; was unable to have his daughters and grandson visit for months at a time; and was deprived of nearly all direct human to human contact.

57.     After his disciplinary hearing, Mr. Williams filed a grievance against Defendants Pelzer and Jones.  His grievance was directed to Defendants Toney, Streeter, and Ellington.  His grievance discussed the due process violations and gave Defendant Pelzer and Defendant Jones reason to anticipate that Mr. Williams might sue them for their actions.

58.     Despite Mr. Williams's grievance, no corrective action was taken.  Instead, Defendants Pelzer, Jones, Parker, Cottles, Allen, Kettleman, Charley, and Simpson retaliated against Mr. Williams further.

**F.     Defendants Violated Mr. Williams's Right to Access the Courts and to Legal Counsel**

59.     In 2007, a Jefferson County jury convicted Mr. Williams, pursuant to Ala. Code § 13A-5-40(a)(17), of intentionally causing a death by shooting a firearm while inside a vehicle. This alleged offense occurred shortly after Mr. Williams's twentieth birthday.  The prosecution did not seek a capital sentence and thus, by operation of statute, the court imposed a mandatory life without parole sentence.

60.     Mr. Williams is in the process of challenging his conviction.

61.     Mr. Williams's sentence implicates the Eighth Amendment to the United States Constitution.  In 2005, *Roper v. Simmons*, 543 U.S. 551, held that imposing a sentence of death on individuals who were juveniles (under the age of 18) at the time of their crime of conviction violated the Eighth Amendment.  In 2010, *Graham v. Florida*, 560 U.S. 48, held that imposing a sentence of life without parole on individuals who were juveniles at the time of their crime of conviction and were convicted of non-homicide offenses violated the Eighth Amendment.  Two

years later, *Miller v. Alabama*, 567 U.S. 460 (2012), held that imposing a mandatory sentence of life without parole on individuals who were juveniles (under the age of 18) at the time of their crime of conviction violated the Eighth Amendment, regardless of the individual's crime of conviction.

62.     Mr. Williams, as noted, was 20 years old when the crime he was convicted of occurred, and he received a mandatory sentence of life without parole.

63.     Thus, the evolution of caselaw about the constitutionality of a sentence of mandatory life without parole, as well as the cutoff age at which individuals are considered "juveniles" are central issues to the constitutionality of Mr. Williams's sentence.

64.     Any case holding that mandatory life without parole sentences for people under 21 at the time of their crime of conviction is unconstitutional is of vital interest in Mr. Williams's ongoing intention to challenge the legality of his sentence.

65.     On March 11, 2021, the Washington State Supreme Court made just such a ruling in *Matter of Monschke*.[10]

66.     In June 2021, Mr. Williams's post-conviction attorney, Joseph Perkovich, mailed Mr. Williams a copy of the 53-page *Monschke* opinion in a Priority Mail envelope that was plainly marked "Legal Mail."  The opinion was printed on environmentally friendly paper made of sugar cane waste products.[11]

67.     On July 1, 2021, the Priority Mail envelope addressed to Mr. Williams with the *Monschke* decision arrived at Limestone with a clear "LEGAL MAIL" stamp across the envelope and Mr. Perkovich's name and return address written on the envelope.

68.     ADOC Administrative Regulation 448 provides that "[a]ll 'Legal Mail' shall be opened and inspected for contraband in the presence of the inmate," and that "'Legal Mail' must not be opened to inspect for contraband except in the presences of the inmate."[12]

---

[10] 197 Wash. 2d 305, 482 P.3d 276 (2021).
[11] *See, e.g.*, https://phys.org/news/2009-03-paper-sugar-cane-trees-money.html.
[12] *See* ADOC Administrative Regulation 448(V)(D)(2)(c), (V)(F)(1).

69.     Despite AR 448's clear direction, Defendant Pelzer opened the envelope outside of Mr. Williams's presence, inspected it, and, by his own admission, destroyed it.

70.     Defendant Pelzer based his conduct on an assertion, unsupported by anything other than his "self inspection" that the pages of the legal mailing were coated in a prison drug known as Flakka.

71.     Mr. Perkovich, who sent the legal mail, did not coat any of the documents in any narcotic or other form of contraband.

**G.     Without Justification, Defendants Imposed Additional Time in Disciplinary Segregation**

72.     After opening Mr. Williams's legal mail outside his presence, Defendant Pelzer charged Mr. Williams with "facilitat[ing] the introduction of contraband at Limestone Correctional Facility" and "delaying, hindering, or interfering with an employee in the performance of his duty." Both charges were based on the exact same factual allegations—that the legal mail Mr. Perkovich had sent Mr. Williams was coated in Flakka.

73.     At Mr. Williams's disciplinary hearing, Defendant Pelzer testified that he based his conclusion that the judicial opinion was coated in drugs only on "self inspection."  He testified that he did not have his suspicion verified by a drug lab.

74.     Defendant Pelzer also testified that the attorney who sent the mail, Mr. Perkovich, "did not exist."

75.     Mr. Perkovich certainly *does* exist, and he had communicated with Limestone officials to schedule legal calls on several occasions before sending Mr. Williams the legal mail. Additionally, during the hearing, Mr. Williams made a statement that gave Mr. Perkovich's name, address, and phone number.

76.     As far as Mr. Perkovich is aware, none of the defendants ever attempted to contact him to verify whether (1) he existed, or (2) he had sent Mr. Williams a legal opinion coated in Flakka.

77.     Defendant Jones was once again Mr. Williams's hearing officer.

78.    Relying, again, on only Defendant Pelzer's uncorroborated testimony, Defendant Jones found Mr. Williams guilty of facilitating contraband and hindering employees.

79.    Defendant Jones sentenced Mr. Williams to an additional 75 days in disciplinary segregation.

80.    Mr. Williams filed a grievance about this violation of his rights, directed to Defendants Toney, Streeter, and Ellington, but they did not redress the issue.

81.    The charge of "[d]elaying, hindering, or interfering with an employee in performance of his / her duty" is listed as a "Medium Level Violation[]" in ADOC's regulations.[13]

82.    It is undefined in ADOC's Administrative Regulations—it is, in fact, listed as "Self-Explanatory."[14]  By contrast, charges such as "Being Fired from a Job" and "Lying" are given definitions.[15]

83.    The vagueness and overbreadth of the "delaying/hindering" charge give correctional officers license to arbitrarily use the charge to punish incarcerated people for doing anything (or, as in Mr. Williams's case, nothing) that the officer disapproves of or is inconvenienced by.

84.    Upon information and belief, Defendant Pelzer has charged all or nearly all of the Black people he has put in disciplinary segregation with "delaying and hindering" rules violations.

85.    Upon information and belief, Defendant Pelzer has charged none or nearly none of the white people in disciplinary segregation with "delaying and hindering."

86.    As a result of Defendants Pelzer's and Jones's conduct before and during Mr. Williams's disciplinary hearing, as well as Defendants Toney's, Streeter's, Crabtree's, and Ellington's failure to address Defendants Pelzer's and Jones's violations of Mr. Williams's

---

[13] *See* ADOC Administrative Regulation 403, Annex A, Page 2 of 3.
[14] *See id.*, Annex C, Page 6 of 9.
[15] *See id.*, Annex C, Page 5 of 9 ("BEING FIRED FROM JOB – Being terminated from employment or assigned job for cause."); *id.* ("LYING – Giving false testimony or making a false charge to an employee with the intent to deceive the employee or to prejudice another person.").

constitutional rights, Mr. Williams and Mr. Perkovich were chilled from continuing to communicate via legal mail while Mr. Williams was incarcerated at Limestone.

87.     Because of the actions described above, Mr. Williams and Mr. Perkovich feared further disciplinary actions against Mr. Williams or other retaliation, including the possibility of unfounded criminal prosecutions.

88.     Because of these fears, Mr. Perkovich stopped sending legal mail to Mr. Williams or visiting Mr. Williams in person.

89.     After obtaining legal advice from Alabama practitioners, Mr. Perkovich also concluded he should not attempt to visit Mr. Williams at Limestone, because of the risk of wrongful arrest and prosecution.

### H.     Limestone Systematically Uses Excessive Force Against People Who Request Fair Treatment in Solitary Confinement

90.     The ADOC and Limestone routinely mistreat and ignore the needs of people who complain about unfair treatment or seek mental health care.

91.     When incarcerated individuals locked in segregation at Limestone complain about unfair treatment or request mental health treatment or support, Limestone officers frequently use threats and excessive force, including violence, to intimidate these individuals into suffering silently.

92.     Limestone officers, including Defendants Jones, Parker, Cottles, Allen, Kettleman, Charley, and Simpson, have sprayed entire cans of riot mace or other chemical spray through the tray holes of the cells of people in solitary confinement and then shut the tray holes and left.  The chemical spray covers or nearly covers the individual's body and all the surfaces within the cell, and the person is thus trapped, helpless, in a small cell filled with chemical spray, with minimal or no ventilation, and with no way of alleviating the burning from the chemical spray.  Often, officers return, open the tray hole again, and empty another can of chemical spray into the cell.

93.     After this, officers will often beat the person with batons, then handcuff them or lock them outside, with minimal protection from the elements, sometimes in freezing cold

temperatures.  Officers frequently leave the person shackled like this until the shift changes, which can be up to twelve hours.

94.    As a result of Limestone officers, chiefly Defendants Jones and Pelzer, having unfairly locked Mr. Williams in disciplinary segregation for such a long period, Mr. Williams endured significant mental health harm, reflected in an anxiety diagnosis.

95.    Under the supervision and with the knowledge of Defendants Ellington, Crabtree, Streeter, and Pelzer, Limestone officers, including Defendants Jones, Parker, Cottles, Allen, Kettleman, Charley, and Simpson, have used the above-described excessive force against several people who requested mental health support.

96.    Defendants' deliberate indifference and violent hostility towards mental health requests from incarcerated people has intimidated Mr. Williams from requesting help when he has needed it.

97.    On the night of July 14, 2021, Mr. Williams's extended time in disciplinary segregation had caused him such mental anguish that he stood up, looked into a mirror, held a razor to his neck, and considered ending his own life.  Mr. Williams knew if he requested mental health support he would likely be pepper-sprayed, beaten, and locked in the cold instead of receiving treatment.  So instead, Mr. Williams continued to suffer.  Only the thought of Mr. Williams's daughters and grandson and the desire to support his family stopped him from ending his life.

I.    **Defendant Limestone Officers Have Subjected Mr. Williams to Retaliation and Excessive Force for Asserting His Right to Freely Exercise His Religious, Cultural, and Spiritual Beliefs**

98.    Defendants have prevented Mr. Williams from freely exercising his religion by telling him that he should "change" religions and forcibly shearing his hair and beard, a critical aspect of his religious identity.

99.    Mr. Williams is a former Islamic minister who has served as a spiritual leader to other incarcerated persons within the ADOC.  Mr. Williams has often spoken about his faith to

other people at Limestone, sharing his wisdom and beliefs in the hope that he might positively impact their lives through faith.

100.    In early 2022, Mr. Williams had grown his hair and beard to about two to three inches.  Mr. Williams's hair and beard length are an expression of his spiritual purity and growth, his belief that God is present within all of us, and his African cultural heritage.

101.    Mr. Williams has made these beliefs clear to Limestone officers, including Defendants Smith, Hines, Pelzer, Jones, Parker, Collins, Allen, Kettleman, Charley, and Simpson, on multiple occasions, and they are well aware of his religious affiliation and convictions.

102.    Defendants have permitted several people incarcerated at Limestone who were non-Black and/or unaffiliated with Islam to maintain hair and beards longer than Mr. Williams's.  The ADOC does not require incarcerated people to shave their heads or beards.

103.    Nonetheless, in early 2022, Defendant Smith repeatedly told Mr. Williams to shave off all of his hair from his head and beard.  Mr. Williams told Defendant Smith he refused to do so for religious, cultural, and spiritual reasons.

104.    On February 5, 2022, Defendant Pelzer was the Lieutenant on duty in charge of supervising the prison.

105.    That day, Defendant Hines came to Mr. Williams's cell and told Mr. Williams he should cut his hair and beard or a group of officers were going to create problems for him.  Mr. Williams told Defendant Hines that Mr. Williams would not cut his hair or beard because of his religious beliefs.

106.    Communicating through another incarcerated person, Mr. Williams told his attorney, Mr. Perkovich, that a group of officers were threatening him if he did not cut his hair and beard.

107.    Mr. Perkovich immediately called the prison and spoke directly with Defendant Pelzer.

108.    Mr. Perkovich told Defendant Pelzer that Mr. Williams was in danger of being assaulted by a group of officers, specifically in connection with having his hair and beard involuntarily sheared, and that such an action would violate Mr. Williams's constitutional rights.

109.    Mr. Perkovich requested that Defendant Pelzer ensure that no officers would attempt to remove Mr. Williams from his cell or otherwise attempt to physically contact him.

110.    Defendant Pelzer told Mr. Perkovich that Mr. Williams would not be contacted or removed from his cell that night.

111.    Nevertheless, later that same night, a group of eight correctional officers, including Defendants Jones, Parker, Cottles, Allen, Kettleman, Charley, and Simpson, came to Mr. Williams's cell and told him his hair and beard would be sheared whether or not he consented.

112.    The officers told Mr. Williams to handcuff himself in preparation for being removed from his cell.

113.    Mr. Williams reiterated that he would not voluntarily cut his hair or beard, because their length was an expression of his spiritual beliefs.  Mr. Williams informed the officers that he would not handcuff himself and was peacefully protesting any actions they took to shear his hair.

114.    The officers sprayed riot pepper spray[16] directly into Mr. Williams's cell through the tray hole.

115.    Attempting to protect himself from the pepper spray, Mr. Williams tried to close the tray hole.  The officers then beat him with batons through the tray hole, hitting him in the groin, midsection, and abdomen.

116.    The officers pepper-sprayed Mr. Williams in the face, temporarily blinding him. The officers then shut the tray hole, leaving Mr. Williams trapped in his small cell filled with chemical spray, with minimal or no ventilation, and with no way of alleviating the burning from the chemical spray.

---

[16] According to the 2020 DOJ report. "Sabre Red is [the] chemical agent, or pepper spray, that is used most frequently in ADOC facilities.  When applied directly to the face, it irritates a person's eyes and causes a burning sensation, pain, and even temporary blindness."

117.    Unable to breathe, Mr. Williams handcuffed himself, hoping that the officers would remove him from his cell and decontaminate him.

118.    Approximately five or ten minutes later, the officers came back and removed Mr. Williams from his cell so that they could forcibly shear his hair and beard.

119.    Mr. Williams remained peaceful and did not fight the officers.  He again informed the officers that he would not use violence, but that he refused to voluntarily cut his hair or beard.

120.    Because Mr. Williams had been subjected to pepper spray, the officers should have taken him to the infirmary to be decontaminated from the pepper spray.  Instead, they gave Mr. Williams a cold shower.

121.    A nurse then evaluated Mr. Williams, conducting a body chart examination in the shower room. Staging this examination there diverted Mr. Williams from admission to the infirmary.

122.    The officers again asked Mr. Williams if he would consent to have his hair and beard cut.  Mr. Williams again informed them that, because of his religious and spiritual beliefs, he would not consent.

123.    The officers shackled Mr. Williams's hands to his ankles, slammed him to the ground, dragged him across the ground to a table, and shoved him onto the table face-down.

124.    They held him in a chokehold, restricting his ability to breathe, and knelt on his back and shackles, painfully contorting his arms and back, and immobilizing him and cutting his arms due to the pressure on the shackles.

125.    Defendant Parker stepped on the chain that ran between Mr. Williams's hands and feet so that Mr. Williams could not move.

126.    Defendant Kettleman held Mr. Williams down by the neck.

127.    Defendant Simpson forcibly sheared Mr. Williams's hair and beard.

128.    Mr. Williams prayed to Allah for help in Arabic.

129.    The officers laughed.

130.    The officers had not yet allowed Mr. Williams to undergo a proper pepper spray decontamination, and the extended physical contact from being held down caused the pepper spray to burn his skin even more severely.

131.    The shearing of Mr. Williams's hair and beard did not bring his hair or beard into compliance with any prison policy or serve any legitimate penological interest.   Instead, Defendants sheared only portions of Mr. Williams's hair: when Defendant Simpson stopped forcibly shearing Mr. Williams's hair, his hair was bald in some places and, in other places, remained the same length it had been before the ordeal.

132.    When they stopped shearing his hair, the officers, Defendants Parker and Cottles in particular, dragged Mr. Williams, still handcuffed, up a set of stairs, with his arms contorted behind him.  This caused Mr. Williams further injuries to his face and arms.

133.    Defendants then handcuffed Mr. Williams to the back of his cell and left him there.

134.    Mr. Williams's cell was still covered in pepper spray, and the bedsheets and mattress had been removed.

135.    Mr. Williams remained peaceful, and he demanded a second body chart examination to document the injuries Defendants had caused him.

136.    Mr. Williams told the Defendants that he would give them his handcuffs if they gave him a body chart examination.  They refused, leaving Mr. Williams handcuffed to the back of his cell for about thirty minutes.

137.    Defendant Simpson then returned and told Mr. Williams he would provide Mr. Williams medical attention if Mr. Williams gave him the handcuffs.  Mr. Williams gave Defendant Simpson his handcuffs.  However, neither Defendant Simpson nor any other defendant gave Mr. Williams access to any medical attention.

138.    The officers left Mr. Williams covered in pepper spray, with no way to decontaminate himself and inadequate protection from the cold, for several hours, until the next shift change.

139.    The officers' assault left Mr. Williams with severe bruising across his body, particularly on his wrists, ankles, back, and face.  He also had several lacerations, which were aggravated by the pepper spray that he had been prevented from adequately washing off.

140.    That evening, after learning of the officers' actions, Mr. Perkovich sent a Cease-and-Desist Letter to Defendant Toney, Defendant Pelzer, and Defendant Smith.  The letter stated:

> I send this emergency correspondence to demand you and your staff cease and desist from assaulting and otherwise violating the rights of my client, Mr. Williams.
>
> I spoke with you by phone tonight at approximately 7:35 p.m. CST and repeatedly confirmed that you and your staff had no plan, intention, or expectation to disrupt my client, Mr. Williams, in his cell tonight or tomorrow morning.  At approximately 9:15 p.m. CST, I was informed that Limestone officers had pepper-sprayed Mr. Williams, then removed him from his cell.  I fear he is now exposed to sub-freezing temperatures in the middle of the night.  At approximately 9:20, I spoke with you, to verify whether your staff had engaged Mr. Williams in his cell.  Instead of taking the necessary actions to redress the ongoing violations of Mr. Williams's rights or even inquiring as to his status, you responded that you did not know because you were not at his cell and attempted to deflect any responsibility for the harms he is suffering.
>
> For many days, including today, my client has expressed concern that prison personnel intend to force him to alter his appearance, specifically, to cut his hair, in contravention of his religious observation and also to use that as a pretext to assault him and charge him with disciplinary violations under the guise of responding to disorderly behavior.  I understand Mr. Williams has repeatedly received threats from Limestone staff, including yourself and Sergeant Luther Smith, of plans to enter his cell and forcibly cut his hair without his consent.  I further understand that staff have invoked sections of Limestone's and/or the Alabama Department of Correction's internal regulations as entitling or even requiring such assaultive behavior in connection with hair length and/or style.
>
> Mr. Williams has a constitutional right to express his beliefs through his hair and be free from unwarranted interference with his body under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution and the Religious Land Use and Institutionalized Persons Act (RLUIPA).  *See Holt v. Hobbs*, 574 U.S. 352 (2015).  I understand the actions taken against Donderrious tonight are among many taken in retaliation against him for asserting his rights in the past.  Any action taken to forcibly cut Mr. Williams's hair would violate these foregoing rights.  I respectfully advise

you not to take any action to that end.  Every moment Mr. Williams is left outside intensifies the severity of Limestone's human rights violations and their liability for them.  Limestone must immediately bring him in from the cold and provide him medical treatment for any injuries he has suffered in a safe environment.

141.    In the aftermath of the assault, the officers refused Mr. Williams's request for a body chart.  They also refused Mr. Williams any medical care despite the numerous lacerations, burns, and bruises he sustained in the assault and the pepper spray still on his body.

142.    The following day, a Captain at Limestone (Captain Caldwell) learned of what had happened and began an investigation.  Mr. Williams continued to request a body chart.

143.    Captain Caldwell told Mr. Williams that if he did not let the matter drop, he would take away Mr. Williams's tablet so that he could not contact anyone. Mr. Williams continued to request a body chart, and Captain Caldwell took away his tablet.

144.    In a further attempt to receive a body chart, Mr. Williams began a hunger strike. At the end of Mr. Williams's hunger strike, he had lost twenty-two pounds.

145.    Defendant Streeter continued to deny Mr. Williams a body chart.

146.    Mr. Williams never received a body chart to document the injuries he experienced on February 5, 2022.

147.    After the February 5, 2022 assault, Defendants charged Mr. Williams with five additional disciplinary violations.  Among those violations, they alleged that Mr. Williams's Islamic prayers were curses against them.

148.    Defendant F. Allen, one of the officers who assaulted Mr. Williams, has since come to Mr. Williams and said, "You need to change your religion."

149.    Mr. Williams's counsel thereafter sent further cease-and-desist correspondence, as well as an evidence preservation letter to the ADOC.

## V.   CAUSES OF ACTION

### COUNT I
**Retaliation for Engaging in Protected Speech**
**First and Fourteenth Amendments, 42 U.S.C. § 1983**
**(Against Defendants Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Kettleman, Charley, Smith, and Simpson, "Count I Defendants")**

150.    Plaintiff repeats and re-alleges the preceding paragraphs 1–149 as if fully set forth herein.

151.    Defendant Pelzer, acting in his individual capacity and under the color of state law, has retaliated against Plaintiff for complaining about race discrimination, advocating for his constitutional rights, and submitting grievances.

152.    In December 2018, Plaintiff complained to Defendant Pelzer that Defendant Pelzer was racist because Defendant Pelzer had accused Plaintiff of belonging to a gang immediately after meeting Plaintiff.

153.    Following that complaint, Defendant Pelzer identified Mr. Williams as someone who would protest Defendant Pelzer's and other officers' discriminatory conduct and mistreatment of incarcerated individuals and advocate for the constitutional rights of incarcerated individuals.

154.    After this initial interaction, Defendant Pelzer and the Count I Defendants repeatedly subjected Mr. Williams to race- and religion-based verbal abuse, harassment, unjustified violent force, false disciplinary actions, extended and unjustified confinement, excessive force, and torture in an attempt to punish and silence Mr. Williams.

155.    Defendant Pelzer fabricated a false account of an incident between Mr. Williams and his cellmate in order to sentence Mr. Williams to disciplinary segregation.

156.    Thereafter, Mr. Williams filed a grievance against Defendants Pelzer and Jones, which gave Defendant Pelzer and Defendant Jones reason to anticipate that Mr.

Williams would sue them for their actions, causing Defendants Pelzer, Jones, Parker, Cottles, Allen, Kettleman, Charley, and Simpson to retaliate against him further.

157.     Thereafter, Defendant Pelzer, outside of Plaintiff's presence, opened, inspected, and destroyed his confidential legal mail in retaliation for Plaintiff's attempt to exercise his rights and protected speech.  In so doing, Defendant Pelzer violated Plaintiff's right to engage in confidential attorney-client communications.  Defendant Pelzer, with the cooperation of Defendant Jones, then used the legal mail to fabricate a basis to sentence him to further solitary confinement.  Plaintiff filed a grievance against Defendants Pelzer and Jones for this as well, causing them to escalate their retaliation.

158.     Plaintiff told Defendants Jones, Parker, Cottles, Allen, Kettleman, Charley, and Simpson about his religious and spiritual beliefs and exercised his religious beliefs by growing out his hair and beard and complained about their wrongful attempts to violate his right to free exercise of religion.   In retaliation for this and his other protected activities, Defendants Jones, Parker, Cottles, Allen, Kettleman, Charley, and Simpson used grossly excessive force to forcibly shear Mr. Williams's head and his facial hair and denied him medical care.

159.     By retaliating against Plaintiff for making complaints and grievances, the Count I Defendants have deprived Plaintiff of his right to freedom of speech and free exercise of religion as guaranteed by the First Amendment to the United States Constitution.

160.     As a direct and legal result of the Count I Defendants' actions and/or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, a chilling effect on his exercise of his First Amendment rights, including freedom of speech and the right to petition the government for redress; physical injury; pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

161.     By engaging in the aforementioned acts and/or omissions and/or in ratifying such acts or omissions, the Count I Defendants engaged in willful, malicious, intentional,

26

and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

**COUNT II**
**Violation of Right to Free Exercise of Religion**
**First and Fourteenth Amendments, 42 U.S.C. § 1983**
**(Against Defendants Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Kettleman, Charley, Smith, and Simpson, "Count II Defendants")**

162.    Plaintiff repeats and re-alleges the preceding paragraphs 1–43 and 98–149 as if fully set forth herein.

163.    Plaintiff exercised his religious and spiritual beliefs by growing out his hair and beard.  In retaliation for this and his other protected activity, Defendants Pelzer, Jones, Parker, Cottles, Allen, Kettleman, Charley, and Simpson used grossly excessive force to forcibly cut Mr. Williams's hair and denied him medical care.

164.    The Count II Defendants have interfered with Plaintiff's right to free exercise of religion as guaranteed by the First Amendment to the United States Constitution.

165.    As a direct and legal result of the Count II Defendants' actions and/or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, a chilling effect on his exercise of his First Amendment rights, including his right to free exercise of religion; physical injury; pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

166.    By engaging in the aforementioned acts and/or omissions and/or in ratifying such acts or omissions, the Count II Defendants engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

**COUNT III**
**Violation of Right to Free Exercise of Religion**
**Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc, et seq**
**(Against Defendants Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Kettleman, Charley, Smith, and Simpson, "Count III Defendants")**

167.     Plaintiff repeats and re-alleges the preceding paragraphs 1–43 and 98–149 as if fully set forth herein.

168.     Defendants were aware of Plaintiff's religious background as a Muslim and his sincerely held spiritual beliefs associated with his beard and hair.  Nonetheless, Defendant Smith told Plaintiff to change his religion.  Thereafter, Count III Defendants violated Plaintiff's rights and chilled his right of religious expression and belief by using grossly excessive force to forcibly shear his head and facial hair.

169.     As a direct and legal result of the Count III Defendants' actions and/or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, physical injury; pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

**COUNT IV**
**Violation of Right to Access the Courts**
**First, Sixth, and Fourteenth Amendments, 42 U.S.C. § 1983**
**(Against Defendants Pelzer and Jones, "Count IV Defendants")**

170.     Plaintiff repeats and re-alleges the preceding paragraphs 1–43 and 59–89 as if fully set forth herein.

171.     Defendant Pelzer, outside of Plaintiff's presence, opened, inspected, and destroyed his plainly marked confidential legal mail.  In so doing, Defendant Pelzer violated Plaintiff's right to engage in confidential attorney-client communications.  Defendant Pelzer, with the cooperation of Defendant Jones, then used the legal mail to fabricate a basis to sentence Plaintiff to further solitary confinement.   Plaintiff filed a grievance against Defendants Pelzer and Jones for this as well, causing them to escalate their retaliation.

172.     As a direct and legal result of the Count IV Defendants' actions and/or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation,

frustration and impediment of his non-frivolous legal claim, a chilling effect on emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

## COUNT V
### Violation of Right to Counsel
### First, Sixth, and Fourteenth Amendments, 42 U.S.C. § 1983
### (Against Defendants Pelzer and Jones, "Count V Defendants")

173.     Plaintiff repeats and re-alleges the preceding paragraphs 1–43 and 59–89 as if fully set forth herein.

174.     Defendant Pelzer, outside of Plaintiff's presence, opened, inspected, and destroyed Plaintiff's confidential legal mail.  In doing so, Defendant Pelzer violated Plaintiff's right to counsel, which includes the right to confidential attorney-client communications. Defendant Pelzer, with the cooperation of Defendant Jones, then used the legal mail to create a false basis to sentence Plaintiff to further solitary confinement.  Plaintiff filed a grievance against Defendants Pelzer and Jones for this as well.

175.     As a direct and legal result of the Count V Defendants' actions and/or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, frustration and impediment of his non-frivolous legal claim, a chilling effect on emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

## COUNT VI
### Cruel and Unusual Punishment – Excessive Force
### Eighth and Fourteenth Amendments, 42 U.S.C. § 1983
### (Against Defendants Jones, Parker, Cottles, C. Allen, F. Allen, Kettleman, Charley, Smith, and Simpson, "Count VI Defendants")

176.     Plaintiff repeats and re-alleges the preceding paragraphs 1–46 and 90–149 as if fully set forth herein.

177.     Defendants Jones, Parker, Cottles, Allen, Kettleman, Charley, and Simpson used excessive amounts of pepper spray in a confined space—Plaintiff's prison cell—such that

Plaintiff could not breathe, beat Plaintiff with batons, slammed him into the floor, dragged him shackled along the floor, slammed him into a table, obstructed his breathing, placed their weight on him in a variety of pressure holds, forcibly sheared his head and his facial hair, left him chained for hours in the cold with inadequate coverings, and denied him medical care.

178.    Defendants' actions inflicted unnecessary and wanton pain and suffering and/or were taken without penological justification.

179.    As a direct and legal result of the Count VI Defendants' actions and/or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, physical injury; pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

180.    By engaging in the aforementioned acts and/or omissions and/or in ratifying such acts or omissions, the Count VI Defendants engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

### COUNT VII
### Cruel and Unusual Punishment – Failure to Protect
### Eighth and Fourteenth Amendments, 42 U.S.C § 1983
### (Against Defendants Hamm, Ellington, Toney, Crabtree, Streeter, and Pelzer, "Count VII Defendants")

181.    Plaintiff repeats and re-alleges the preceding paragraphs 1–46 and 90–149 as if fully set forth herein.

182.    The Count VII Defendants have violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by failing to protect Plaintiff from excessive force and torture.  The Count VII Defendants knew or should have known of the practice of using excessive force and torture against people in solitary confinement and failed to prevent such practice from being perpetrated against Plaintiff.

183.     Defendants are and have been incarcerating Plaintiff and other people under conditions presenting a substantial risk of serious harm.  Defendants know of and disregard that risk of substantial harm to Plaintiff and incarcerated people like him by failing to take necessary remedial action to end ongoing practices that cause serious harm to incarcerated people.

**COUNT VIII**
**Cruel and Unusual Punishment – Failure to Intervene**
**Eighth and Fourteenth Amendments, 42 U.S.C § 1983**
**(Against Defendants Pelzer, Hines, Jones, Parker, Cottles, C. Allen, F. Allen, Kettleman, Charley, Smith, and Simpson, "Count VIII Defendants")**

184.     Plaintiff repeats and re-alleges the preceding paragraphs 1–46 and 90–149 as if fully set forth herein.

185.     The Count VIII Defendants have violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by failing to intervene to stop the use of grossly excessive force against Plaintiff. The Count VIII Defendants knew of, witnessed, and/or perpetrated the use of excessive force and torture against Plaintiff and failed to prevent it.

186.     As a direct and legal result of the Count VIII Defendants' actions and/or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

187.     By engaging in the aforementioned acts and/or omissions and/or in ratifying such acts or omissions, the Count VIII Defendants engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

## COUNT IX
**Cruel and Unusual Punishment – Deliberate Indifference to a Serious Medical Need**
**Eighth and Fourteenth Amendments, 42 U.S.C. § 1983**
**(Against Defendants Toney, Crabtree, Streeter, Pelzer, Jones, Parker, Cottles,**
**C. Allen, F. Allen, Kettleman, Charley, Smith, and Simpson, "Count IX Defendants")**

188.     Plaintiff repeats and re-alleges the preceding paragraphs 1–43 and 90–149 as if fully set forth herein.

189.     The Count IX Defendants were aware of the injuries that had been caused to Plaintiff during the February 5, 2022 assault.  Plaintiff requested to be taken to the infirmary and/or receive other medical assistance several times, via in person requests and requests through his attorneys.  The Count IX Defendants refused to take Plaintiff to the infirmary or provide him with other medical assistance.  Through their policies and practices described herein, the Count IX Defendants have subjected Plaintiff to a substantial risk of serious harm and injury from inadequate mental health treatment in violation of the Eighth and Fourteenth Amendments.

190.     As a direct and legal result of the Count IX Defendants' actions and/or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

191.     By engaging in the aforementioned acts and/or omissions and/or in ratifying such acts or omissions, the Count IX Defendants engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

## COUNT X
**Racial Discrimination**
**Fourteenth Amendment, 42 U.S.C. § 1983**
**(Against Defendants Pelzer and Jones, "Count X Defendants")**

192.     Plaintiff repeats and re-alleges the preceding paragraphs 1–46 and 81–97 as if fully set forth herein.

193.     Under the Equal Protection Clause, discrimination based on race is presumptively unconstitutional and subject to strict scrutiny.

194.     Defendant Pelzer told Plaintiff that he must be in a gang because he is Black. Defendant Pelzer discriminated against Plaintiff based on Plaintiff's status as a Black man. Defendant Pelzer targeted Plaintiff for the conduct taken against him described above on the basis of his race.

195.     Defendant Pelzer also subjected Plaintiff to racial discrimination by charging him with 'delaying and hindering,' which, upon information and belief, he did not do to similarly situated white incarcerated people.  Defendant Jones approved these disciplinary reports and sentenced Plaintiff to solitary confinement.

196.     As a direct and proximate result of the Count X Defendants' unlawful actions, Plaintiff has suffered injury, including but not limited to additional time spent in solitary confinement and emotional distress, entitling Plaintiff to compensatory damages in an amount to be proven at trial.

197.     By engaging in the aforementioned acts and/or omissions and/or in ratifying such acts or omissions, the Count X Defendants engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

**COUNT XI**
**Religious Discrimination**
**Fourteenth Amendment, 42 U.S.C. § 1983**
**(Against Defendants Jones, Parker, Cottles, C. Allen, F. Allen, Kettleman, Charley, Smith, and Simpson, "Count XI Defendants")**

198.     Plaintiff repeats and re-alleges the preceding paragraphs 1–43 and 98–149 as if fully set forth herein.

199.     Defendants Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Kettleman, Charley, Smith, and Simpson subjected Plaintiff to religious discrimination.  Defendant Smith told Plaintiff

he needed to change his religion.  Defendants Jones, Parker, Cottles, C. Allen, F. Allen, Kettleman, Charley, and Simpson then subjected Plaintiff to grossly excessive force in order to forcibly shear his head and facial hair because it was an expression of his spiritual beliefs. Defendants did not subject people of other religions to this treatment.

200.    By engaging in the aforementioned acts and/or omissions and/or in ratifying such acts or omissions, the Count XI Defendants engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

### COUNT XII
### Violation of Right to Due Process
### Fourteenth Amendment, 42 U.S.C. § 1983
### (Against Defendants Ellington, Toney, Crabtree, Streeter, Pelzer, and Jones,
### "Count XII Defendants")

201.    Plaintiff repeats and re-alleges the preceding paragraphs 1–58 and 90–97 as if fully set forth herein.

202.    Plaintiff is serving a life sentence.  Plaintiff has a protected liberty interest in remaining free from the imposition of solitary confinement without penological justification. While in solitary confinement, Plaintiff was confined to a small cell for at least twenty-three hours per day; lacked access to visitors, including his daughters and grandson; could not participate in educational programs; and could not exercise without wearing handcuffs. Plaintiff had his liberties restricted in these ways due to the unconstitutional imposition of disciplinary segregation.

203.    Count XII Defendants violated Plaintiff's liberty interest when failing to adhere to the due process requirements for imposing disciplinary segregation.

204.    In or around July 2021, Defendant Pelzer, in breach of Plaintiff's liberty interests, falsely charged Plaintiff with another disciplinary violation, alleging he violated state and federal law by introducing contraband, through his attorney, into Limestone. Defendant

Jones oversaw the disciplinary hearing that violated Plaintiff's due process rights. In violation of Plaintiff's due process rights, Defendants Streeter, Toney, and Ellington failed to rescind the disciplinary report and imposition of further disciplinary segregation.   Count XII Defendants subjected Plaintiff to the gratuitous, further unconstitutional hardship of an additional approximately seventy-five days of solitary confinement.

205.     As a direct and proximate result of Count XII Defendants' unlawful actions, Plaintiff has suffered injury, including but not limited to additional time spent in solitary confinement and emotional distress, entitling Plaintiff to compensatory damages in an amount to be proven at trial.

### COUNT XIII
### Deliberate Indifference to a Serious Risk of Harm
### Eighth and Fourteenth Amendments, 42 U.S.C. § 1983
### (Against All Defendants)

206.     Plaintiff repeats and re-alleges the preceding paragraphs 1–149 as if fully set forth herein.

207.     By their policies and practices described herein, Defendants have subjected Plaintiff to a substantial risk of serious harm and injury from excessive force in violation of the Eighth and Fourteenth Amendments.   Defendants have known of, witnessed, and/or perpetrated the use of excessive force and torture against people who assert their rights or complain about the conditions of confinement in disciplinary segregation. Defendants knew or should have known that there was a substantial risk that this practice would be perpetrated against Plaintiff.   Defendants failed to take necessary action to remediate these issues and/or directly participated in perpetuating these issues.

208.     As a direct and legal result of the Defendants' actions and/or omissions, Plaintiff has suffered and continues to suffer damages including, without limitation, physical injury; pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a.  For injunctive relief enjoining Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law:

    i.  To update, develop, and/or adopt the ADOC's and all the ADOC facilities' policies, procedures, practices and structures to:

        A.  prohibit the spraying of pepper spray into locked disciplinary segregation cells;

        B.  prohibit the locking, chaining, or other confinement of people who have been exposed to pepper spray for longer than reasonably necessary to address immediate danger; and

        C.  prohibit the locking, chaining, or other confinement of people under circumstances where they are exposed to danger or pain due to the temperature or other environmental conditions.

    ii.  To rescind and remove all disciplinary reports from Plaintiff's file that arise from the incidents in this matter;

    iii.  From subjecting Plaintiff to the illegal and unconstitutional conditions, acts, omissions, and practices set forth above;

b.  For declaratory relief stating that the acts, omissions, policies, and practices of the Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise, described herein are in violation of the rights of Mr. Williams under the United States Constitution and the Religious Land Use and Institutionalized Persons Act, which grant protection to Mr. Williams;

c.  For compensatory, general, and special damages, in an amount to be determined at trial;

d.  For punitive damages in an amount to be proven at trial;

e.  For reasonable attorneys' fees and costs to Plaintiff pursuant to 42 U.S.C. § 1988;

f.  For trial by jury; and

g.  Such other relief as the Court finds appropriate in the interest of justice.

Respectfully submitted this 30th day of June 2023.

/s/ Joseph Mitchell McGuire
Joseph Mitchell McGuire
(ASB-8317-S69M)
Susanne Emily Cordner
(ASB-4687-C61N)
McGuire & Associates, LLC
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000 (voice)
jmcguire@mandabusinesslaw.com
scordner@mandabusinesslaw.com

Felicia Medina
(CA Bar No. 255804) (pro hac to be filed)
Alexander Brooks
(CA Bar No. 340178) (pro hac to be filed)
Medina Orthwein LLP
230 Grand Ave, Suite 201
Oakland, CA 94610
510-823-2040
fmedina@medinaorthwein.com
abrooks@medinaorthwein.com

Attorneys for Plaintiff Donderrious Williams