FILED
2024 Dec-13  AM 11:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|                              |     |                              |
|------------------------------|-----|------------------------------|
| DONDERRIOUS WILLIAMS,        | )   |                              |
|                              | )   |                              |
| Plaintiffs,                  | )   |                              |
|                              | )   |                              |
| vs.                          | )   | Case No.  5:24-cv-00706-HNJ  |
|                              | )   |                              |
| JEREMY PELZER, et al.,       | )   |                              |
|                              | )   |                              |
| Defendants.                  | )   |                              |

## MEMORANDUM OPINION AND ORDER

Donderrious Williams, a person incarcerated by the Alabama Department of Corrections (ADOC), filed this case on June 30, 2023, in the United States District Court for the Middle District of Alabama.  (Doc. 1).  His Third Amended Complaint, filed February 16, 2024, asserts eleven federal statutory and constitutional causes of action against fourteen defendants, all of whom serve either as corrections officers, wardens, or the Commissioner for ADOC.  (Doc. 66).  On February 27, 2024, all Defendants but John Ketteman filed a motion to dismiss Plaintiff's claims.  (Doc. 67).  On May 22, 2024, the Middle District of Alabama transferred the case to this court.  (Docs. 88, 89).  On August 30, 2024, the court permitted Defendant Ketteman to join the other Defendants' motion to dismiss.  (Doc. 104).

For the reasons explored in depth herein, the court will partially grant and partially deny Defendants' motion to dismiss.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a cause of action if it fails to state a claim upon which relief may be granted. To assess a motion to dismiss under that rule, courts must first take note of the elements a plaintiff must plead to state the applicable claims at issue. *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009).

After establishing the elements of the claims at issue, the court identifies all well-pleaded, non-conclusory factual allegations in the complaint and assumes their veracity. *Id.* at 679. Well-pleaded factual allegations do not encompass mere "labels and conclusions," legal conclusions, conclusory statements, or formulaic recitations and threadbare recitals of the elements of a cause of action. *Id.* at 678 (citations omitted). In evaluating the sufficiency of a plaintiff's pleadings, the court may draw reasonable inferences in the plaintiff's favor. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005).

Third, a court assesses the complaint's well-pleaded allegations to determine if they state a plausible cause of action based upon the identified claim's elements. *Iqbal*, 556 U.S. at 678. Plausibility ensues "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and the analysis involves a context-specific task requiring a court "to draw on its judicial experience and common sense." *Id.* at 678, 679 (citations omitted). The plausibility standard does not equate to a "probability requirement," yet

2

it requires more than a "mere possibility of misconduct" or factual statements that are

"'merely consistent with a defendant's liability.'"  *Id.* at 678, 679 (citations omitted).

## ALLEGATIONS OF WILLIAMS'S THIRD AMENDED COMPLAINT

ADOC has incarcerated Williams, a Black man, former Islamic minister, and

practitioner of the Muslim and Metu Neter faiths, since 2007.  Williams currently resides

at Donaldson Correctional Facility, but at the time of the events giving rise to this suit

he resided at Limestone Correctional Facility (Limestone).  (Doc. 66, ¶ 1, 97).

Defendants Jeremy Pelzer, Michael Jones, Steven Parker, Christopher Cottles, C.

Simpson, Luther Smith, C. Allen, F. Allen, Thomas Hines, John Ketteman, and

Demetrius Charley served as corrections officers at Limestone.  The corrections officers

bore responsibility "for ensuring the safety and security of incarcerated people and the

supervision of all subordinate employees."  (*Id.* ¶¶ 2-12).

Defendants Deborah Toney and William Streeter served as Wardens at

Limestone and bore responsibility for "the day-to-day operations at the prison, the

approval of disciplinary charges, the safety of all incarcerated people at Limestone, and

the supervision of all subordinate employees."  (*Id.* ¶¶ 13-14).

Defendant John Hamm has served as the Commissioner of ADOC since January

1, 2022.  In that capacity, Hamm

> is responsible for heading the ADOC, for the independent direction,
> supervision, and control of the ADOC, and for approving and issuing
> administrative regulations and changes. . . .   Defendant Hamm is

3

responsible for providing constitutional conditions of confinement in all facilities.  At all relevant times, Defendant Hamm has acted under color of state law.

(*Id.* ¶ 15).  Williams sued Charley, Streeter, and Hamm in their respective individual and official capacities.  He sued all other Defendants in their individual capacities only.  (*Id.* ¶¶ 2-15).

### *Department of Justice Reports Addressing Past Constitutional Violations by ADOC*

According to Williams's Third Amended Complaint, the United States Department of Justice (DOJ) has issued "two landmark reports detailing its reasonable cause to believe that the prison conditions faced by male incarcerated people in Alabama violate the Eighth Amendment's prohibition on cruel and unusual punishment."  (*Id.* ¶ 22).

In April 2019, the DOJ "detailed 'the contributing factors to the overall unconstitutional condition of ADOC prisons,' resulting in a culture in which ADOC routinely failed to provide incarcerated people with safe living conditions or protect them from violence and abuse caused by other incarcerated people."  (Doc. 66, ¶ 23).  "The report also stated DOJ's view that ADOC officials demonstrated deliberate indifference to the substantial risk of serious harm posed to people incarcerated in ADOC Facilities resulting from these unconstitutional conditions."  (*Id.*).

"In July 2020, the DOJ issued a second report addressing the ADOC's failure to protect incarcerated people from ADOC officers' rampant use of excessive force."  (*Id.*

¶ 24).   The 2020 report identified "widespread use of excessive force against incarcerated men."  ADOC officers "'frequently use excessive force on prisoners' in 12 of 13 Alabama prisons, including Limestone."  The force manifests in the use of batons, chemical spray, and physical altercations that "'often result in serious injuries and, sometimes, death,'" and officers use force "'in the absence of a physical threat,'" without making an effort to de-escalate tense situations.  (*Id.* ¶ 25).  Officers even use force on incarcerated people they have already handcuffed, or who otherwise pose no physical threat.   (*Id.* ¶ 26).

The 2020 report also found that ADOC officers frequently and inappropriately use chemical spray on incarcerated persons who do not present a danger to punish them for failing to comply with a verbal order.  "Such use of chemical spray is directly contrary to ADOC regulations directing that the use of chemical spray must only be resorted to when an incarcerated person cannot be controlled through other, less violent, methods."    "The DOJ found that 'chemical spray is regularly used as retribution' in ADOC facilities in violation of the federal Constitution."  (*Id.* ¶ 27).  In addition, officers commonly strike incarcerated persons, or use even more severe force, when the person does not obey an officer's commands, even if the person does not physically resist or present a threat to others."  (Doc. 66, ¶ 28).

The 2020 report found that officers either did not report or underreported instances of force, and ADOC investigators found complaints of force "to be

'unsubstantiated[,] . . . despite the absence of critical information in investigative files.'"

(*Id.* ¶ 29 (alterations in original)).

> The report further described a lack of accountability in the ADOC's procedures for reviewing uses of force. Specifically, the report noted that ADOC correctional officers regularly failed to report or document their uses of force; that officers' uses of force were "frequently not investigated" by ADOC's investigatory division, or that investigations that did occur were "frequently inadequate"; that officers' use of force was frequently unaddressed; and that there was little evidence of resulting discipline. The result of this lack of accountability was "a culture where unlawful uses of force are common."

(*Id.* ¶ 30). The report "concluded that unlawful incidents of excessive force and the underreporting of those incidents would 'likely continue to occur until such time as the conditions within Alabama's prisons are affirmatively addressed.'" (*Id.* ¶ 31).

On December 9, 2020, the DOJ sued ADOC and the State of Alabama for Eighth and Fourteenth Amendment violations in Alabama prisons. The DOJ's complaint in that case "alleged that since [DOJ's] 2019 report, incarcerated men in Alabama 'have continued daily to endure a high risk of death, physical violence, and sexual abuse,' and that 'the United States has determined that constitutional compliance cannot be secured by voluntary means.'" (*Id.* ¶ 32).[1]

Williams alleges conditions in ADOC facilities have not improved since the DOJ

---

[1] Williams's Third Amended Complaint asserts the case is set for trial in 2024 (Doc. 66, ¶ 32), but the court has now pushed the trial to at least mid-2025. (*See* Second Amended Scheduling Order at 2, *United States v. Alabama*, No. 2:20-cv-01971-RDP (N.D. Ala. April 1, 2024)) (stating that the case shall be "Pre-Trial Ready" in "May 2025")).

reports, especially for people of color.  Incarcerated persons, especially those in segregation, suffer from high suicide rates.  (*Id.* ¶ 33).  "Fifty-six percent of people in Alabama prisons are Black, although only twenty-seven percent of the State's general population is Black."  (Doc. 66, ¶ 34).

Williams alleges all Defendants maintain awareness of the "ongoing issues" in Alabama's prisons.

> Defendant Hamm receives information about litigation involving the ADOC, including each of the aforementioned active cases.  Defendants Hamm and Streeter receive reports and updates about the inadequate mental health and security conditions at Limestone in the normal course of their duties.  Defendants Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson have been personally involved in the use of excessive force against incarcerated people, and they have specifically targeted Black men for excessive force and retaliation.

(*Id.* ¶ 35).  Even so, "Defendants have failed to take action to redress these well-known issues, and conditions have remained the same or in some cases worsened."  (*Id.* ¶ 36).

### *Williams's Arrival at Limestone and Interaction with Pelzer in December 2018*

When Williams transferred to Limestone in December 2018, "Defendant Pelzer approached him and asked, 'Are you in a gang?'  Mr. Williams responded with a comment to the effect of, 'No, why I got to be in a gang?'  Defendant Pelzer replied, 'Because you're Black.'"  (*Id.* ¶ 37).  Williams responded by asking Pelzer if he was in the Klan.  (*Id.* ¶ 38).  After that interaction, Pelzer and other officers retaliated against Williams by subjecting him to "race- and religion-based verbal abuse, harassment, and

unjustified violent force, as well as extended and unjustified confinement in Limestone's administrative segregation." (*Id.* ¶ 40).

*March 5, 2021, Incident and Administrative Segregation*

On March 5, 2021, Williams's cellmate attacked Williams in their cell. After ascertaining the incident, Defendant Jones placed Williams in an outdoor holding cell for over an hour, despite Williams's complaints about the cold and his need to use a bathroom. (Doc. 66, ¶¶ 41-43). Williams's cellmate later informed officers Williams bore no blame for the incident, which no other individuals witnessed, yet Pelzer charged Williams with two violations of the facility's rules. (*Id.* ¶ 44).

Williams participated in a rules violation hearing on April 6, 2021, yet he complains of multiple procedural irregularities related to the hearing. Though ADOC regulations require facilities to staff rules violation hearings with hearing officers uninvolved with the underlying incidents, Jones served as Williams's hearing officer. (*Id.* ¶¶ 45-46). Though ADOC regulations ensure inmates the right to call witnesses at rules violations hearings, Jones refused Williams's request to call his cellmate as a witness. (*Id.* ¶¶ 47-48). Though ADOC regulations require officers to hold hearings within ten days of the disciplinary report, Jones conducted Williams's hearing either 23 or 32 days after the report. (*Id.* ¶¶ 49-50).[2] During the hearing, Jones relied entirely on

---

[2] Williams first alleges that the altercation with his cellmate occurred on March 5, 2021. (Doc. 66, ¶ 41). He later alleges officers filed a disciplinary report on March 15, 2021. (*Id.* ¶ 50). The court cannot

Pelzer's uncorroborated testimony to find Williams guilty and sentence Williams to disciplinary segregation. (*Id.* ¶ 51). After the hearing, Williams filed a grievance against Pelzer and Jones alleging due process violations. He directed the grievance to Defendants Toney and Streeter, yet no officers took corrective action. (Doc. 66, ¶¶ 54-55).

Though Williams does not specify the amount of disciplinary segregation time levied against him due to the findings of the April 6 hearing, he remained in disciplinary segregation a total of 591 days. (*Id.* ¶ 52). He

> was confined to a six foot by nine foot cell for an average of approximately 23 hours and 56 minutes per day; could only participate in one educational program; could not exercise without being shackled and having his hands cuffed behind his back; was unable to have his daughters and grandson visit for months at a time; and was deprived of nearly all direct human to human contact.

(*Id.* ¶ 53).

### *July 1, 2021, Destruction of Legal Mail and Additional Disciplinary Segregation*

Sometime in June 2021, Joseph Perkovich, Williams's post-conviction attorney, mailed him a copy of a legal opinion in a Priority Mail envelope plainly marked "Legal Mail" and containing Perkovich's name and address. (*Id.* ¶ 63). The opinion pertained to Williams's challenge to his original conviction due to his alleged status as a juvenile

---

discern whether officers issued the report ten days after the incident occurred, or whether the Third Amended Complaint contains a typographical error. Regardless, the hearing occurred more than ten days after either March 5 or March 15.

at the time of the conviction.  (*Id.* ¶¶ 56-61).  Perkovich printed the 53-page opinion on environmentally friendly paper made from sugar cane waste products.  The envelope arrived at Limestone on July 1, 2021.  (*Id.* ¶¶ 63-64).  Though ADOC regulations require officers to open and inspect legal mail in the presence of the inmate, Pelzer opened the envelope outside of Williams's presence, inspected it, and destroyed the contents based upon a purported and mistaken belief that Perkovich had coated the pages with a drug. (Doc 66, ¶¶ 65-68).

After opening and destroying Williams's legal mail, Pelzer charged Williams with "'facilitat[ing] the introduction of contraband . . .' and 'delaying, hindering, or interfering with an employee in the performance of his duty.'"  (*Id.* ¶ 69) (alteration in original). Pelzer based those charges on his belief Perkovich had coated the paper with drugs. (*Id.*).  During Williams's disciplinary hearing for those charges, Pelzer acknowledged he did not test the paper for drugs, as he based his suspicion solely on his own inspection. He also testified he believed Perkovich did not exist. (*Id.* ¶¶ 70-71).  However, Perkovich had communicated with unidentified officials at Limestone in the past by scheduling legal calls, submitting a copy of his bar license, providing contact information, and receiving approval for visits and calls.  (*Id.* ¶ 72).  No officer attempted to contact Perkovich to verify his existence, or to verify he sent Williams legal communications.  (*Id.* ¶ 73).

Jones, who again served as Williams's hearing officer, found Williams guilty of

both charges and sentenced him to an additional 75 days in disciplinary segregation. (Doc. 66, ¶¶ 74-76). Williams filed a grievance with Toney and Streeter about the outcome of the hearing, but he did not receive any redress. (*Id.* ¶ 77). Because of the discipline Williams received and the officers' failure to address his grievance, Williams feared further discipline and retaliation, and Perkovich stopped sending Williams legal mail or visiting him at Limestone to avoid such retaliation. (*Id.* ¶¶ 83-86).

ADOC regulations classify the "delaying and hindering" charge as a medium level violation, but the regulations do not define the nature of the charge. (*Id.* ¶¶ 78-79). Williams asserts the vagueness and overbreadth of the charge "give correctional officers license to arbitrarily use the charge to punish incarcerated people for doing anything (or in Mr. Williams's case, nothing) that the officer disapproves of or is inconvenienced by." (*Id.* ¶ 80). He also asserts Pelzer often uses the "delaying and hindering" charge to place Black inmates in disciplinary segregation, yet he rarely uses the charge to segregate White inmates. (*Id.* ¶¶ 81-82).

### February 5, 2022, Assault and Aftermath

Williams identifies as Muslim, also practices the Metu Neter faith, previously served as an Islamic minister, and often expresses his faith to officers (including those he named as Defendants) and other inmates. (Doc. 66, ¶¶ 97-99). In early 2022, he grew his hair and beard to a length of approximately two to three inches as an expression of his spiritual and religious beliefs and African cultural heritage. (*Id.* ¶ 98).

Officers permit members of other faiths and races to wear beards and hair longer than Williams wore his. (*Id.* ¶ 100). Even so, Defendant Smith repeatedly commanded Williams to shave his hair and beard. Williams refused for religious, cultural, and spiritual reasons. (*Id.* ¶ 101).

On February 5, 2022, Pelzer served as the shift commander. "As part of the ADOC's custom and practice of retaliating against incarcerated people in solitary confinement who assert their constitutional rights, including by complaining about their conditions of their confinement, Defendant Pelzer enabled Defendant Jones to organize an assault on Mr. Williams." (*Id.* ¶ 102). On that date, Defendant Hines came to Williams's cell and told him if he did not cut his hair and beard, "a group of officers were going to create problems for him." Williams refused due to his religious beliefs. (*Id.* ¶ 103).

Another inmate overheard that conversation and contacted Perkovich to warn him an officer had threatened Williams. (Doc. 66, ¶ 104). Perkovich immediately called the prison and informed Pelzer that Williams faced immediate danger of assault by officers for refusing to shave his hair and beard, an action that would violate Williams's constitutional rights. (*Id.* ¶¶ 105-06). Pelzer assured Perkovich that no officers would contact Williams or remove Williams from his cell that night. (*Id.* ¶¶ 107-08).

Even so, later that night, a group of at least eight officers, including Defendants Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, and Simpson, went to

12

"Mr. Williams's cell and told him that his hair and beard would be sheared whether or not he consented." (*Id.* ¶ 109). Some of the officers, "including at least Defendants Charley and Parker, told Mr. Williams to handcuff himself in preparation for being removed from his cell." (*Id.* ¶ 111). Williams informed the officers he would not handcuff himself or cut his hair or beard, even if they wrote him up for refusing their requests. He asserted a peaceful protest to any actions they took to cut his hair. (*Id.* ¶ 112).

Multiple officers, including at least Charley and Parker, sprayed riot mace pepper spray directly into Williams's cell through the tray hole, even though they had access to less dangerous pepper spray. They also sprayed Williams in the face, which blinded him, and they shut off the ventilation to the cell. Due to its potency, officers should use riot mace spray only outdoors or in well-ventilated areas, and they should ensure anyone sprayed with riot mace receives fresh air and medical treatment if necessary. (Doc. 66, ¶¶ 113-14).

The officers did not provide Williams with any decontamination treatment. Rather, unspecified officers used batons to beat Williams's groin, midsection, and abdomen via the tray hole. (*Id.* ¶ 115). Multiple officers, including at least Charley and Parker, again sprayed Williams in the face with riot mace, then shut and locked the tray hole, leaving Williams choking on the spray, with no ventilation, for five to ten minutes. They then opened the tray hole, sprayed the riot mace again, and shut the tray hole.

13

The volume of riot mace they used caused dozens of other inmates in the cell block to cough, choke, and cry.  (*Id.* ¶¶ 116-17).  Williams then agreed to handcuff himself, yet he told the officers he would continue his peaceful protest and refuse to cut his hair. (*Id.* ¶ 118).

The officers left Williams in the cell for approximately five to ten more minutes, then removed him "to the dayroom at the center of the dorm, in full view of the rest of the dorm, to humiliate [him] and to make an example of him for standing up for his rights."  (*Id.* ¶ 119).  Williams remained peaceful and did not use violence toward the officers, but he maintained his refusal to cut his hair and beard due to his spiritual and religious beliefs.  Defendant C. Allen told Williams the officers would harm him if he continued to assert his rights and beliefs.  (*Id.* ¶ 120).

The officers refused to take Williams to the infirmary for decontamination; rather, they called a nurse to evaluate Williams in the shower room of the cell blook. (Doc. 66, ¶¶ 121-22).

> By staging his examination there, the [officers] diverted Mr. Williams from admission to the infirmary, where his condition would have been appropriately documented and responsible medical staff may have intervened to prevent the [officers] from harming him further.  Moreover, conducting the body chart *before* their planned violent assault of Mr. Williams allowed the [officers] to claim they had documented all of Mr. Williams's injuries, while permitting them to avoid documenting the additional injuries they would later cause during the violent acts they had yet to commit . . . .  Mr. Williams urged the nurse to stay because the officers were about to assault him.  Defendant Parker told the nurse to leave, which she did.

14

(*Id.* ¶ 122 (emphasis in original)).

The officers again asked Williams to consent to cutting his hair and beard, but he again refused due to his spiritual and religious beliefs. (*Id.* ¶ 123). The officers then "hog-tied" Williams's hands to his ankles with shackles, picked him up, slammed him to the floor, dragged him across the floor, and shoved him face-first onto a metal table in the day room. (*Id.* ¶ 124). They "placed their weight on Mr. Williams, kneeling on his back and shackles, severely restricting his breathing, painfully twisting his arms and back in stress positions, and cutting his arms and ankles due to the pressure on the sharp shackles." (*Id.* ¶ 125). The extended physical contact and lacerations caused the pepper spray remaining on his skin to burn even more severely. (*Id.* ¶ 126).

In addition, Defendant Ketteman held Williams down by the neck, choking him. (Doc. 66, ¶ 127). Williams struggled to survive, as he could barely breathe in the choke hold, and he continued to suffer the effects of the pepper spray. (*Id.* ¶ 128). Defendant Parker repeatedly stomped on the chain that ran between Williams's hands and feet, which contorted and cut his body. (*Id.* ¶ 129). Defendant Simpson forcibly sheared parts of Williams's hair and beard, even though a barber was available in the facility, leaving Williams's head bald in some places but with full-length hair in other places. (*Id.* ¶¶ 130-34). Williams told the officers he could not breathe and asked them to stop

their actions, but they did not stop.  (*Id.* ¶ 131).  He prayed to Allah for help in Arabic, yet the officers laughed and joked.  (*Id.* ¶¶ 132-33).

When the officers completed shearing Williams's hair, they dragged Williams, still handcuffed, up a set of a stairs, causing cuts, bruises, muscle strain, and joint strain. (Doc. 66, ¶ 135).  They left him handcuffed in his cell, which was still contaminated with pepper spray and no longer contained a mattress or sheets.  The officers refused Williams's multiple requests for medical treatment and for a body chart to document his injuries.  (*Id.* ¶¶ 136-39).

After approximately 30 minutes to an hour, Simpson returned and informed Williams he would provide medical attention if Williams turned over his handcuffs. Williams complied, but he did not receive any medical attention.  (*Id.* ¶¶ 140, 143).  His injuries – including severe bruising and lacerations on his wrists, ankles, back, and face; muscle pain and strain in his neck and body; full body aches; and long, deep lacerations aggravated by the pepper spray – caused pain lasting several days.  (*Id.* ¶ 141).

Perkovich obtained notice of the officers' actions that evening and sent a cease-and-desist letter to Toney, Pelzer, and Smith, asking the officers to cease any actions to forcibly cut Williams's hair in violation of his statutory and constitutional rights.  (*Id.* ¶ 142).[3]

---

[3] The letter also expressed Perkovich's belief that officers had left Williams outside in the cold, yet Williams concedes the officers did not do so.  (Doc. 66, at 28 n.23).

Due to the configuration of the cell block, the perpetration of the assault in the common area, and the officers' desire to make an example out of Williams, dozens of other inmates witnessed the assault. Some inmates protested by flooding the area with toilet water or threatening suicide. (*Id.* ¶ 144). As a result of the flood, officers shut off the water to Williams's cell, then left him in the cell overnight with no running water, blankets, sheets, or means of pepper spray decontamination, and with dirty water up to his ankles. (Doc. 66, ¶ 145).

Captain Caldwell, who Williams did not name as a Defendant, attained notice of the incident the following morning and commenced an investigation. Williams continued to request a body chart, but Caldwell told him if he persisted, Caldwell would take away his tablet, which would prevent him from contacting anyone outside the prison. Williams persisted, and Caldwell followed through with his promise to take away the tablet. (*Id.* ¶¶ 147-48). Williams then began a hunger strike until he received a body chart. (*Id.* ¶ 149). The Third Amended Complaint does not state how long Williams continued his hunger strike; it remarks only that he ended it because cameras captured much of the officers' conduct. By the time the strike ended, Williams had lost 22 pounds. (*Id.* ¶¶ 149, 151).

Williams spoke to Streeter in person, but Streeter continued to deny him a body chart. "Other Limestone staff requested to follow protocol and conduct a body chart but Defendant Streeter said something to the effect of 'we not taking no pictures.'" (*Id.*

¶ 150). Williams never received a body chart or decontamination after the February 5, 2022, incident. (*Id.* ¶ 151).

Officers charged Williams with five additional disciplinary violations after the February 5, 2022, incident, including allegations that Williams uttered Islamic prayers as curses against them. (Doc. 66, ¶ 152). Defendant F. Allen told Williams he needed to change his religion. (*Id.* ¶ 153).

Williams alleges the officers' mistreatment of him occurred "pursuant to a pattern, practice, and custom of deliberate indifference to incarcerated people's constitutional rights and retaliation against them." (*Id.* ¶ 155). Furthermore, "Defendant Hamm and each of the other defendants were made aware of the extreme conditions at Limestone that posed an unreasonable risk of serious injury to the health and safety of people such as Mr. Williams via the DOJ reports, *Braggs v. Dunn*, and dozens of instances of excessive use of pepper spray and other force that had occurred at Limestone, and all Defendants failed to take corrective action, enabling the harms that occurred to Mr. Williams." (*Id.*).

Williams also alleges in further specificity that officers at Limestone routinely neglect, and use excessive force on, people who request medical assistance and fair treatment in solitary confinement, and such treatment affected Williams's mental health tremendously. (*Id.* ¶¶ 88-95).

18

*Williams's Complaint in this case*

Williams filed his initial Complaint on June 30, 2023. (Doc. 1). His Third

Amended Complaint, filed February 16, 2024, asserts the following causes of action:

1.  Retaliation for engaging in protected speech pursuant to the First and Fourteenth Amendments, against Defendants Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson (Count I).

2.  Violation of the right to free exercise of religion, pursuant to the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* (RLUIPA), against Defendants Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson (Count II).

3.  Violation of the Sixth and Fourteenth Amendment right to counsel, against Defendants Pelzer and Jones (Count III).

4.  Cruel and unusual punishment – excessive force in violation of the Eighth and Fourteenth Amendments, against Defendants Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson (Count IV).

5.  Cruel and unusual punishment – failure to protect in violation of the Eighth and Fourteenth Amendments, against Defendants Hamm, Toney, Streeter, and Pelzer (Count V).

6.  Cruel and unusual punishment – failure to intervene in violation of the Eighth and Fourteenth Amendments, against Defendants Pelzer, Hines, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson (Count VI).

7.  Cruel and unusual punishment – deliberate indifference to a serious medical need in violation of the Eighth and Fourteenth Amendments, against Defendants Toney, Streeter, Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson (Count VII).

8.  Racial discrimination in violation of the Fourteenth Amendment, against Defendants Pelzer and Jones (Count VIII).

9.    Religious discrimination in violation of the Fourteenth Amendment, against Defendants Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson (Count IX).

10.   Fourteenth Amendment due process violations, against Defendants Toney, Streeter, Pelzer, and Jones (Count X).

11.   Deliberate indifference to a serious risk of harm in violation of the Eighth and Fourteenth Amendments, against all Defendants (Count XI).

(Doc. 66).

## DISCUSSION

Defendants moved to dismiss Williams's Third Amended Complaint in its entirety, asserting the following arguments:  (1) the statute of limitations bars any claims accruing prior to June 30, 2021; (2) Eleventh Amendment immunity bars Williams's official capacity claims; (3) Williams's claims fail to state a claim upon which the court can grant relief; and (4) qualified immunity bars Williams's individual capacity claims. (Doc. 67).

## I.    THE TWO-YEAR STATUTE OF LIMITATIONS BARS CLAIMS THAT ACCRUED AFTER JUNE 30, 2021

The parties agree a two-year statute of limitations governs Williams's 42 U.S.C. § 1983 claims for constitutional violations.  They also concur Williams can only pursue claims that accrued on or after June 30, 2021, as he filed his original Complaint on June 30, 2023.  (*See* Doc. 68, at 7 ("Plaintiff's claims are governed by a two-year statute of

limitations"); Doc. 77, at 55 ("Plaintiff filed his original Complaint on June 30, 2023. . .

. Therefore, the statute of limitations is tolled as of June 30, 2021.")).[4]

Defendants argue any claims based upon the following events accrued prior to

June 30, 2021:  (1) Williams's interaction with Pelzer upon his arrival at Limestone in

December 2018 (Doc. 66, ¶¶ 37-40); (2) the March 5, 2021, attack by Williams's cellmate

(*Id.* ¶¶ 41-43); and (3) the April 6, 2021, disciplinary hearing, resulting in Williams's

sentence to disciplinary segregation (*Id.* ¶¶ 44-55).  Those allegations support portions

of the following counts of Williams's Complaint:  (1) Count I, for First Amendment

retaliation; (2) Count VII, for race-based Equal Protection violations; and (3) Count X,

for Fourteenth Amendment Due Process violations.

A claim for violation of constitutional rights accrues "when the plaintiff has a

complete and present cause of action," or, stated differently, "when the plaintiff can file

suit and obtain relief."  *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (cleaned up).  That

---

[4] The Eleventh Circuit applies the relevant state statute of limitations for tort claims – in Alabama, two years – to claims for constitutional violations pursuant to 42 U.S.C. § 1983.  *Iriele v. Griffin*, 65 F.4th 1280, 1282 n.1 (11th Cir. 2023).  Most courts apply the general four-year statute of limitations set forth in 28 U.S.C. § 1658(a) to RLUIPA claims.  *See Spearman v. Williams*, No. 22-1309, 2023 WL 7000971, at *4 (6th Cir. July 17, 2023); *Jones v. Lumpkin*, No. 21-20106, 2023 WL 3075063, at *1 (5th Cir. Apr. 25, 2023); *MorningStar Fellowship Church v. York Cnty., S.C.*, No. 20-1896, 2022 WL 3754528, at *1 (4th Cir. Aug. 30, 2022), *cert. denied*, 143 S. Ct. 1021, 215 L. Ed. 2d 188 (2023); *Gilmore v. Silva*, 812 F. App'x 689, 690 (9th Cir. 2020); *Pettigrew v. Zavaras*, 574 F. App'x 801, 807 (10th Cir. 2014); *Williams v. Dixon*, No. 4:23-CV-359-AW-MAF, 2024 WL 3510298, at *1 (N.D. Fla. July 23, 2024); *Schwindler v. Owens*, No. 1:11-CV-1276-TCB-LTW, 2012 WL 12925713, at *4 n.2 (N.D. Ga. Mar. 6, 2012). However, Defendants did not raise a statute of limitations challenge to Williams's RLUIPA claim, and a review of the Third Amended Complaint reveals all events supporting that claim occurred well within the four-year statutory period.

generally occurs when a plaintiff "know[s] or ha[s] reason to know that they were injured, and [is] aware or should be aware of who inflicted the injury." *McGroarty v. Swearingen*, 977 F.3d 1302, 1309 (11th Cir. 2020) (citing *Rozar v. Mullis*, 85 F.3d 556, 562 (11th Cir. 1996)).

A.     **The Statute of Limitations Bars Any Claims for First Amendment Retaliation Based Directly Upon the Outcome of the April 6, 2021, Disciplinary Hearing as a Discrete Act of Retaliation, Yet Williams's Other First Amendment Retaliation Claims Are Timely**

A First Amendment retaliation claim accrues when the plaintiff discerns the retaliatory action. *Coates v. Natale*, 409 F. App'x 238, 240 (11th Cir. 2010) ("Coates's First Amendment claim accrued when she learned of the Defendants' decision to expel her."). Though Williams's initial interaction with Pelzer in December 2018 may have caused Pelzer to form a negative opinion of Williams, that interaction did not manifest a contemporaneous retaliatory consequence. Rather, Williams alleges he first suffered retaliation when Pelzer colluded with Jones to provide an inadequate disciplinary hearing on April 6, 2021. As that hearing took place more than two years before June 30, 2023, the statute of limitations bars any claims based directly upon the outcome of the hearing as a discrete act of retaliation.

Williams also alleges Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson thereafter continued to subject him to "other race- and religion-based verbal abuse, harassment, unjustified violent force, false disciplinary

22

actions, extended and unjustified confinement, excessive force, and torture in an attempt to punish and silence [him]." (Doc. 66, ¶ 161). To the extent Williams relies upon other discrete acts of retaliation occurring after June 30, 2021, or to the extent he may assert Defendants engaged in a continuing pattern of retaliatory behavior, the statute of limitations would not bar those claims.[5] However, other than the alleged

---

[5] Even if Williams cannot assert a timely discrete claim based upon events occurring prior to June 30, 2021, the facts surrounding those events may bear relevance as background information for other claims. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.").

Williams may also claim Defendants' actions constituted a continuing violation, as he continued to experience retaliation on an ongoing basis, continuing into the limitations period.

> Under the continuing-violation doctrine, a plaintiff may "sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." *Doe ex rel. Doe v. Swearingen*, 51 F.4th 1295, 1305 (11th Cir. 2022) (quoting *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006)). For instance, "[i]f a defendant's actions violate a plaintiff's rights on a repeated or ongoing basis, then a cause of action may be timely even if the first violation took place outside the statute of limitations." *Id.*

> But we apply that doctrine only in limited circumstances. We "distinguish[ ] between the present consequence of a one time violation, which does not extend the limitations period, and the continuation of the violation into the present, which does." *Id.* (alteration in original) (quoting *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993)). The continuing-violation doctrine applies in only the second scenario. And the continuing-violation doctrine similarly does not apply when a plaintiff alleges "a series of repeated violations that result in repeated harms." *Id.* at 1306 (citing *Morgan*, 536 U.S. at 113, 122 S. Ct. 2061). In those cases, "each new violation" starts the clock on its own limitations period. *Id.*

*Wainberg v. Mellichamp*, 93 F.4th 1221, 1227-28 (11th Cir. 2024) (alterations in original).

Absent argument from the parties on this point, the court declines to determine whether Defendants' actions represented a series of repeated violations that resulted in repeated harms, each

conduct expressly averred by Williams in his Third Amended Complaint, the foregoing general averments do not withstand the plausibility standard. Therefore, claims based upon those general averments warrant dismissal.

The second and third retaliatory actions Williams alleges – the July 1, 2021, destruction of his legal mail (*Id.* ¶¶ 162-63), and the February 5, 2022, excessive force and forcible hair shearing incident (*Id.* ¶ 166) – occurred within the two-year limitations period, and thus, suffer no limitations period bar.

### B.    The Statute of Limitations Bars Any Race-Based Equal Protection Claim Arising from Verbal Discrimination Occurring in 2018, Yet Williams's Other Race-Based Equal Protection Claims Are Timely

An Equal Protection claim based upon race discrimination accrues when the plaintiff knows or should know the discrimination occurred. *See Foudy v. Indian River Cnty. Sheriff's Off.*, 845 F.3d 1117, 1123 (11th Cir. 2017) (reaffirming application of the "discovery rule" to Equal Protection claims).

Williams asserts Pelzer "verbally discriminated against [him] based on [his] status as a Black man." (Doc. 66, ¶ 201). To the extent Williams asserts Pelzer exhibited discrimination during their initial encounter in 2018, that claim would fall outside the limitations period. Any verbal discrimination occurring after June 30, 2021, could serve as the basis for a timely claim.

---

with its own limitations period, or the continuation of a previous violation or violations into the statutory period. The parties may revisit that issue in more detail, if necessary, at summary judgment.

Williams also asserts Pelzer discriminated against him by charging him with "delaying and hindering," and Jones approved those discriminatory charges and sentenced him to additional disciplinary segregation. Those charges occurred after Pelzer opened Williams's legal mail on July 1, 2021, rendering the claims within the limitations period.

### C. The Statute of Limitations Bars Any Fourteenth Amendment Due Process Claim Arising from the April 6, 2021, Hearing, Yet Not the July 1, 2021, Hearing

A procedural due process claim stands "complete," and therefore accrues, "when 'the State fails to provide due process.'" *Reed v. Goertz*, 598 U.S. 230, 236 (2023). Williams alleges Toney, Streeter, Pelzer, and Jones violated his due process rights by failing to adhere to the procedural requirements for imposing disciplinary segregation. To the extent he complains about the procedures followed in the April 6, 2021, disciplinary hearing, that hearing fell outside the limitations period, and any claim based upon that hearing as a discrete act would be time-barred.[6]

However, Williams received a second disciplinary hearing following Pelzer's opening of his legal mail on July 1, 2021. Any claims based on the alleged inadequacies of that hearing would fall within the limitations period.

---

[6] Even so, Williams remained in disciplinary segregation 591 days, well into the two-year limitations period. As discussed in the previous footnote, to the extent Williams presents a continuing violation theory, the facts surrounding the April 6, 2021, hearing may bear relevance, and the court will consider any arguments on such a theory, if necessary, at a later stage.

II.    **THE ELEVENTH AMENDMENT PROHIBITS ALL CLAIMS FOR MONETARY DAMAGES AGAINST DEFENDANTS CHARLEY, STREETER, AND HAMM, IN THEIR RESPECTIVE OFFICIAL CAPACITIES, YET IT PERMITS CLAIMS AGAINST THOSE DEFENDANTS IN SUCH CAPACITIES FOR PROSPECTIVE INJUNCTIVE AND DECLARATORY RELIEF**

As discussed, Williams sued Defendants Charley, Streeter, and Hamm in their respective individual and official capacities.  Those Defendants assert the Eleventh Amendment to the United States Constitution grants them immunity from the official capacity claims.

The Eleventh Amendment bars 42 U.S.C. § 1983 claims against the State or an agency of the State, unless the State has consented to suit, waived its immunity, or Congress abrogated the State's immunity.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment… This jurisdictional bar applies regardless of the nature of the relief sought." (citations omitted)); *Carr v. City of Florence*, 916 F.2d 1521, 1525 (11ᵗʰ Cir. 1990).  Alabama has neither consented nor waived its immunity, *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (finding Article I, § 14, of the Alabama Constitution prohibits Alabama from giving its consent and therefore the State of Alabama was entitled to Eleventh Amendment immunity), and Congress has not abrogated Alabama's immunity in § 1983 cases. *Carr*, 916 F.2d at 1525.

As an agency of the State of Alabama, ADOC enjoys Eleventh Amendment immunity. *See Pugh*, 438 U.S. at 782 (concluding the Alabama Board of Corrections stood as an agency of the State of Alabama immune from suit pursuant to the Eleventh Amendment); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding "neither a State [nor governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes] nor its officials acting in their official capacities are 'persons' under § 1983); Ala. Code § 14-1-1.1 (creating ADOC as the successor to the Alabama Board of Corrections). The immunity also extends to ADOC employees acting in their official capacities. *Austin v. Glynn Cnty., Georgia*, 80 F.4th 1342, 1347 (11th Cir. 2023), *cert. denied sub nom. Austin v. Glynn Cnty.*, 144 S. Ct. 1060, 218 L. Ed. 2d 242 (2024) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)) ("'The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials' when they act as 'an arm of the State.'" *See also Jacoby v. Thomas*, No. 18-14541-C, 2019 WL 5697879, at *1 (11th Cir. Oct. 16, 2019) ("[T]he district court correctly found that all defendants were entitled to Eleventh Amendment immunity for Mr. Jacoby's official-capacity claims because the record reflected that they were employed by the ADOC."); *Williams v. Womble*, No. 2:15-CV-728-ECM-SMD, 2019 WL 1996692, at *3 (M.D. Ala. Apr. 5, 2019), *report and recommendation adopted*, No. 2:15-CV-728-ECM, 2019 WL 1992125 (M.D. Ala. May 6, 2019) ("Defendants, as employees of the Alabama Department of Corrections or acting as state agents, are entitled to sovereign immunity

under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.").[7]

However, the Eleventh Amendment does not protect state officials from "a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis," as such a suit "is not a suit against the state." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011) (citing *Ex Parte Young,* 209 U.S. 123 (1908); *Frew ex rel. Frew v. Hawkins,* 540 U.S. 431, 437 (2004)). Williams's Third Amended Complaint requests an injunction requiring Defendants to update policies regarding the use of pepper spray and the confinement of persons exposed to pepper spray; rescind and remove all of Williams's disciplinary reports from his file; and cease subjecting him to unconstitutional actions and policies. (Doc. 66, at 43-44). As those requests operate prospectively, the Eleventh Amendment does not prevent such claims against Charley, Streeter, and Hamm, in their official capacities.[8]

---

[7] The parties' briefs discuss only Eleventh Amendment immunity, but the court also observes that Defendants Charley, Streeter, and Hamm, in their official capacities, may not constitute "persons" subject to suit under 42 U.S.C. § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding "neither a State nor its officials acting in their official capacities are 'persons' under § 1983"). As with Eleventh Amendment immunity, Williams may nonetheless seek prospective declaratory or injunctive relief from those Defendants. *See also Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) ("A state, a state agency, and a state official sued in his official capacity are not 'persons' within the meaning of § 1983, thus damages are unavailable; but a state official sued in his official capacity is a person for purposes of § 1983 when prospective relief, including injunctive relief, is sought." (citing *Will*, 491 U.S. at 71 n.10)).

[8] Other concerns may eventually warrant consideration, though Defendants have not raised them at this stage of the proceedings.

The Third Amended Complaint also requested a declaration that

> the acts, omissions, policies, and practices of the Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise, described herein are in violation of the rights of Mr. Williams under the United States Constitution, which grant[s] protection to Mr. Williams.

(*Id.* at 44). Those requests operate both retrospectively and prospectively. Williams asks the court to declare unlawful Defendants' past actions and omissions, yet he also asks the court to assess Defendants' policies and practices, which may manifest in the future. *See Benning v. Comm'r, Georgia Dep't of Corr.*, 71 F.4th 1324, 1335 (11th Cir. 2023), *cert. denied sub nom. Benning v. Oliver*, 144 S. Ct. 1457 (2024) (observing that "a prayer for declaratory relief generally seeks a declaration of both past and future conduct"). The

---

First, Williams must establish his standing to pursue injunctive relief by demonstrating "a 'real or immediate threat that [he] will be wronged again,' or, in other words, a 'likelihood of substantial and immediate irreparable injury." *Wilson v. Sec'y, Dep't of Corr.*, 54 F.4th 652, 668 (11th Cir. 2022) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). "In cases where a plaintiff seeks injunctive relief, pointing only to past injuries and speculating that such harm will 'inevitabl[y]' occur again is insufficient to establish standing." *Wilson*, 54 F.4th at 668 (citing *Lyons*, 461 U.S. at 102) (alteration in original). Williams's transfer from the Limestone facility may call into question his exposure to immediate repeat injury, though he may receive an injunction "'to prevent a substantial risk of serious injury from ripening into actual harm'" if he can establish the possibility of a transfer back to Limestone as well as a failure by ADOC officials to firmly commit to revise any unlawful policies regarding the use of pepper spray. *Thomas v. Bryant*, 614 F.3d 1288, 1319 (11th Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 839 (1994)).

In addition, Williams's request for an injunction requiring Defendants to cease subjecting him to unconstitutional actions and policies may represent an impermissible "obey-the-law injunction." Courts disfavor such overly broad injunctions as they "run afoul of Rule 65(d)'s requirement that injunctions state their terms specifically and 'describe in reasonable detail' the 'act or acts restrained or required,'" which "are 'designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.'" *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1361-62 (11th Cir. 2019) (quoting Fed. R. Civ. P. 65(d); *SEC v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012)).

Eleventh Amendment permits the prospective declarations, but not the retrospective declarations. *See id.* at 1336 (Eleventh Amendment did not bar "requests for declaratory relief as to those claims [that] are worded in the present tense, and do not simply seek a declaration of past wrongdoing"); *Higdon v. Tusan*, 746 F. App'x 805, 810 (11th Cir. 2018) (Eleventh Amendment barred requests for "entry of an order declaring that the state court violated federal law in the past or overturning state court orders").

In summary, the Eleventh Amendment does not completely prohibit Williams's official capacity claims against Defendants Charley, Streeter, and Hamm, but it limits the claims as afore-discussed.

## III.  WILLIAMS'S THIRD AMENDED COMPLAINT FAILS TO STATE A VIABLE CLAIM FOR RELIEF IN COUNTS II, III, AND X, YET HIS OTHER CLAIMS MAY WHOLLY OR PARTIALLY PROCEED.

Defendants assert all of Williams's claims fail to state viable causes of action. As to Williams's constitutional claims against officers in their individual capacities, Defendants also assert qualified immunity protects them from suit.

### A.  Williams's RLUIPA Claim in Count II Cannot Proceed Against Any of the Named Defendants in Their Individual or Official Capacities.

Williams asserts one statutory claim, Count II, pursuant to RLUIPA. He alleges Defendant Smith violated his right to free exercise of religion under RLUIPA when he ordered Williams to change his religion, and Defendants Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson violated his RLUIPA rights

when they forcibly sheared his hair and beard.  He also avers Defendant Pelzer violated his RLUIPA rights when he instructed and/or permitted the other Defendants to forcibly shear his hair and beard.

RLUIPA does not permit a litigant to obtain monetary damages against state officials in their individual capacities.  *Smith v. Allen*, 502 F.3d 1255, 1275 (11th Cir. 2007) (concluding "section 3 of RLUIPA – a provision that derives from Congress' Spending Power – cannot be construed as creating a private action against individual defendants for monetary damages"), *abrogated on other grounds by Sossamon v. Texas*, 563 U.S. 277, 286-87 (2011), *overruled on other grounds by Hoever v. Marks*, 999 F.3d 1353 (11th Cir. 2021) (en banc); *see also Hathcock v. Cohen*, 287 F. App'x 793, 798 (11th Cir. 2008) (per curiam) ("[T]his Court concluded that RLUIPA does not create a private action for monetary damages against prison officials sued in their individual capacity." (citing *Smith*, 502 F.3d at 1275)); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 329 (5th Cir. 2009) ("[A]s a matter of statutory interpretation and to avoid the constitutional concerns that an alternative reading would entail, we decline to read Congress's permission to seek 'appropriate relief against a government' as permitting suits against RLUIPA defendants in their individual capacities.").  As Williams sued Smith, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Smith, and Simpson in their individual capacities only, his RLUIPA claims against those Defendants cannot proceed, and the court need not consider those Defendants' arguments that qualified immunity protects them from suit.

*See Smith,* 502 F.3d at 1275 n.11 (citing *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir. 1991)) ("[B]ecause we conclude that section 3 of RLUIPA does not permit a claim against the defendant-appellees in their individual capacities, we need not address the secondary question of whether the defendant-appellees would be entitled to a defense of qualified immunity.").

Williams sued Defendant Charley in both his individual and official capacities. (Doc. 66, ¶ 12).  The court will dismiss the individual capacity claim for the reasons discussed previously.  As to the official capacity claim, the Supreme Court has held that sovereign immunity bars RLUIPA claims for money damages against state officials in their official capacities.  *Sossamon,* 563 U.S. at 280, 293; *see also Robbins v. Robertson,* 782 F. App'x 794, 801 n.4 (11th Cir. 2019) (citing *Sossamon,* 563 U.S. at 280, 293) ("[T]he district court correctly concluded that . . . sovereign immunity bars RLUIPA claims for money damages against state officials in their official capacities.").  Moreover, Williams cannot obtain injunctive relief against Charley in his official capacity because Williams no longer resides at Limestone, the facility that employed Charley.  *See Davila v. Marshall,* 649 F. App'x 977, 980-81 (11th Cir. 2016) (citing *Spears v. Thigpen,* 846 F.2d 1327, 1328 (11th Cir. 1988)) ("[T]he district court properly dismissed as moot Davila's request for injunctive relief under RLUIPA because he had been transferred to another prison."); *see also Tucker v. Thomas,* No. 7:20-CV-720-KOB-GMB, 2022 WL 706948, at *5 n.7 (N.D. Ala. Jan. 20, 2022), *report and recommendation adopted,* No. 7:20-CV-00720-KOB-

32

GMB, 2022 WL 702438 (N.D. Ala. Mar. 8, 2022) ("Even if the court were to construe Tucker's complaint as alleging a RLUIPA claim, this claim would fail because only prospective injunctive relief is available under RLUIPA, but Tucker has been transferred away from Bibb Correctional Facility."); *Dees v. Lamar*, No. 2:20-CV-1326-LSC-GMB, 2021 WL 1953137, at *13 (N.D. Ala. Mar. 4, 2021), *report and recommendation adopted*, No. 2:20-CV-1326-LSC-GMB, 2021 WL 1661195 (N.D. Ala. Apr. 28, 2021) ("Because solely prospective injunctive relief is available under RLUIPA and Dees no longer is incarcerated at Bibb Correctional Facility, his claims based on the denial of religious identification or permission to grow a beard while at Bibb are moot."); *Moore v. Entrekin*, No. 4:18-CV-00224-KOB-JEO, 2019 WL 2178639, at *5 (N.D. Ala. Apr. 15, 2019), *report and recommendation adopted*, No. 4:18-CV-00224-KOB-JEO, 2019 WL 2172711 (N.D. Ala. May 20, 2019) ("Because the plaintiff is no longer in the custody of the Etowah County Detention Center and, given the length of his federal sentence, not likely to return to that custody, no active case or controversy is before this court concerning the plaintiff's claims under RLUIPA.").[9]

---

[9] As stated in the preceding footnote, though a plaintiff may obtain an injunction "to prevent a substantial risk of serious injury from ripening into actual harm," such prerogative persists only when "a history of past misconduct . . . gives rise to an inference that future injury is imminent." *Thomas,* 614 F.3d at 1318 (cleaned up).  "A plaintiff seeking injunctive relief to prevent future injury must 'establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury is certainly impending.'" *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 115 F.4th 1266, 1281 (11th Cir. 2024) (citation omitted).  "Likewise, a plaintiff has standing to seek declaratory relief only when 'there is a substantial likelihood that he will suffer injury in the future.'" *Id.* (citation omitted). "'The controversy

As Williams cannot succeed against any of the named Defendants for the relief

he requests under RLUIPA, the court will dismiss Williams's RLUIPA claim.

**B.    Qualified Immunity Precludes Some, But Not All, of Williams's Constitutional Claims.**

As to Williams's other claims, all of which assert constitutional violations,

Defendants argue qualified immunity protects them from suit.  Qualified immunity

protects government officials performing discretionary functions in their individual

capacities from civil suit and liability "'insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have

known.'" *Hill v. Cundiff*, 797 F.3d 948, 978 (11ᵗʰ Cir. 2015) (quoting *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982)).

"When a court concludes [an official] was engaged in a discretionary function,

'the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified

immunity.'" *Hill*, 797 F.3d at 978 (emphasis in original) (citation omitted).  There exists

no dispute the Defendants performed discretionary functions as to the alleged

---

between the parties cannot be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury.'" *Id.* (citation omitted).

Williams avers the existence of a pattern of excessive force and misuse of pepper spray, yet he has alleged no facts demonstrating a history of forcibly shearing inmates' hair or beards, particularly by the Defendant against whom he asserts an entitlement to injunctive and declaratory relief.  Thus, even if Williams received a transfer back to the Limestone facility, there exist no allegations suggesting he would suffer a "real or immediate threat" of future harm under RLUIPA.  *Wilson,* 54 F.4th at 668 (cleaned up).

circumstances, so Williams bears the burden of persuading the court Defendants should not enjoy immunity.

"To defeat qualified immunity, '(1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of defendant's conduct.'" *Carruth v. Bentley*, 942 F.3d 1047, 1054 (11th Cir. 2019) (quoting *Taylor v. Hughes*, 920 F.3d 729, 732 (11th Cir. 2019)). Courts retain discretion to adjudicate one prong without addressing the other. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Determining whether a constitutional right was clearly established may proceed in three guises. A right may be clearly established by "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Hill*, 797 F.3d at 979 (citation omitted). Under the second, afore-cited method, "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* (citation omitted). The "clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019).

In further exposition, a right is clearly established if a defendant acted on "fair warning" that his conduct violated the constitutional rights of the plaintiff. *Hope v.*

*Pelzer*, 536 U.S. 730, 739 (2002) (citing *United States v. Lanier*, 520 U.S. 259 (1997)).  As elaborated, "fair warning" may emanate either from factually similar case law or where the right is one of 'obvious clarity' – i.e., where the officer's conduct "lies so obviously at the very core of what the [constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law" on point.  *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009)).

In determining whether a right was clearly established, the court refers to binding decisions of the United States Supreme Court, the Eleventh Circuit, and the highest court of the pertinent state.  *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (citing *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 561-63 (2007)).

As Defendants also contend Williams failed to state viable causes of action for the alleged constitutional violations, the court will elect to assess whether Williams' Third Amended Complaint sets forth violations of a constitutional right before turning to whether the law clearly established the right at the time of the violation.  For many claims, that approach will resolve the qualified immunity analysis.[10]

---

[10] Defendants' brief appears to concur that at this stage, the qualified immunity analysis turns primarily on whether Williams stated viable constitutional violations. Resting upon Williams's alleged failure to state any viable claims, Defendants do not assert any arguments regarding whether Williams's rights were clearly established at the time of the alleged violations.  (*See* Doc. 68, at 23 ("Plaintiff has failed to state any claims in which he is entitled to relief . . . .  Because Plaintiff has failed to state any claims, he has also failed to allege a violation of clearly established law.  Therefore, Defendants are entitled to qualified immunity, and all claims against them are due to be dismissed.")).

1.      **Count I states viable claims for First Amendment retaliation based upon Williams's April 2021 and July 2021 grievances and his open expressions and defense of his religious beliefs, yet not his December 2018 complaint to Pelzer about racism.**

In Count I, Williams alleges Defendants Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson retaliated against him for engaging in protected speech, in violation of the First and Fourteenth Amendments.  To state a viable First Amendment retaliation claim, Williams must allege he engaged in protected speech, officials retaliated against him, he suffered an adverse effect on his protected speech, and a causal relationship existed between the retaliation and the adverse effect. *Smart v. England*, 93 F.4th 1283, 1289 (11th Cir. 2024) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005), *abrogated in part on other grounds by Pearson*, 555 U.S. 223).  "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1254. The causal connection element of a retaliation claim requires the plaintiff to demonstrate that his protected conduct was a motivating factor behind the retaliatory action. *Jacoby v. Baldwin Cnty.*, 666 F. App'x 759, 762 (11th Cir 2016) (citing *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008)).[11]

---

[11] At a later stage, the court may subject the causation analysis to the burden-shifting framework the Supreme Court set forth in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).  Under that framework, Williams first "must show that his constitutionally-protected speech was a 'motivating factor'" in Defendants' decisions to carry out adverse actions. *Williams v. Radford*, 64 F. 4th 1185, 1193 (11th Cir. 2023) (citing *Mt. Healthy,* 429 U.S. at 287).  If he makes that showing, the burden shifts to Defendants to "show that [they] would have implemented those adverse actions irrespective of"

Williams alleges he engaged in three types of protected activity that resulted in retaliation:  (1) complaining to Pelzer in December 2018 that Pelzer was racist; (2) filing grievances against Pelzer and Jones after his April 2021 and July 2021 disciplinary hearings; and (3) openly expressing his religious beliefs to Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, and Simpson; exercising his religious beliefs by growing his hair and beard; resisting Smith's command to change his religion; and complaining about the officers' wrongful attempts to violate his religious rights.

> **(a)  Williams does not state a viable claim for First Amendment retaliation based upon his December 2018 complaint to Pelzer about racism.**

Williams alleges his December 2018 complaint to Pelzer resulted in manufactured charges regarding an incident with Williams's roommate in March 2021, an unfair disciplinary hearing in April 2021, and "other race- and religion-based verbal abuse, harassment, unjustified violent force, false disciplinary actions, extended and unjustified confinement, excessive force, and torture in an attempt to punish and silence" Williams.  (Doc. 66, ¶¶ 159-61; *see also id.* ¶ 40).  As previously discussed, the statute of limitations bars any claim that Williams's interaction with Pelzer in 2018 resulted in fabricated charges in March 2021 or an inadequate disciplinary hearing in April 2021. As to allegations of persistent retaliation that might support a timely

---

Williams's protected speech.  *Id.*

continuing violation claim, Williams's complaint lacks sufficient detail to connect any of the named Defendants with a continuing pattern of retaliatory action.

As an initial matter, Williams complained to Pelzer about Pelzer's alleged, discriminatory remark.  He did not complain to any of the other named Defendants, and he does not offer any allegations demonstrating the other Count I Defendants knew of his complaint.  Even as to Pelzer, Williams does not offer sufficient facts to connect his complaint to any future retaliatory actions by Pelzer.  *See Nicholson v. Harrison*, No. 5:18-CV-01128-AKK-HNJ, 2021 WL 3928835, at *18 (N.D. Ala. June 14, 2021), *report and recommendation adopted*, No. 5:18-CV-01128-AKK-HNJ, 2021 WL 3913180 (N.D. Ala. Sept. 1, 2021) ("[B]road, conclusory allegations of retaliation do not suffice to state a constitutional claim. Consequently, claims alleging unconstitutional retaliation must be factual, and mere conclusory allegations of retaliation will not suffice.").  The lengthy time period between Williams's comment to Pelzer and any timely alleged retaliatory actions also suggests the two events do not share a causal connection.  *See Stallworth v. Tyson*, 578 F. App'x 948, 951 (11th Cir. 2014) (citing *Stanley v. City of Dalton,* 219 F.3d 1280, 1282, 1291 & n.20 (11th Cir. 2000)) ("Although we have yet to hold in a published opinion that a close temporal proximity between protected speech and an adverse action may serve as circumstantial evidence of causation in a prisoner's First Amendment retaliation claim, we have determined in another type of retaliation case that temporal proximity is relevant to proving causation."); *Melendez v. Dixon*, No. 3:20-

CV-1023-BJD-JBT, 2022 WL 1500637, at *3 (M.D. Fla. May 12, 2022) ("In the absence of direct evidence showing a causal connection, a plaintiff may establish that element by showing a close temporal connection between the protected activity and the alleged retaliatory conduct."). Perhaps recognizing these pleading deficiencies, Williams's response brief does not characterize his remark to Pelzer about Pelzer's alleged racism as protected activity under the First Amendment. Rather, Williams's brief focuses only on the two other instances of protected speech discussed herein.

Therefore, Williams does not assert a viable claim for First Amendment retaliation based upon Williams's remarks to Pelzer in 2018.

> **(b)** **Williams states a viable claim for First Amendment retaliation based upon his April 2021 and July 2021 grievances, and qualified immunity does not protect the named defendants from suit on that claim.**

The grievances Williams filed in April 2021 and July 2021 constituted protected activity under the First Amendment. *Christmas v. Nabors*, 76 F.4th 1320, 1334 (11th Cir. 2023) (citing *Smith*, 532 F.3d at 1276) ("Christmas's allegations satisfy the first element because he engaged in protected speech when he filed grievances and asked for access to outdoor recreation.").

In retaliation for that activity, Pelzer allegedly destroyed Williams's legal mail on July 1, 2021 (within the limitations period), and subsequently Jones and Pelzer allegedly fabricated a basis to subject Williams to solitary confinement. (Doc. 66, ¶ 163). Those

actions both constitute adverse actions, as both actions likely would deter a person of reasonable firmness from exercising future First Amendment rights. *Williams v. Radford*, 64 F.4th 1185, 1193 (11th Cir. 2023) ("[P]lacing an inmate in disciplinary/segregated confinement constitutes an adverse action for purposes of a First Amendment retaliation claim."); *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) (confiscating an inmate's mail in retaliation for filing grievances can violate the First Amendment).

The allegedly retaliatory destruction of Williams's mail implicates only Defendant Pelzer. Williams sufficiently alleges his grievances constituted a motivating factor behind Pelzer's decision to destroy Williams's mail. (*See* Doc. 66, ¶ 163 ("Pelzer . . . destroyed Plaintiff's confidential legal mail in retaliation for Plaintiff's attempts to exercise his rights and engage in protected speech. . . . Pelzer took this action as part of a continuing pattern of retaliation against Plaintiff's continued protected activities . . . .")). In addition, Williams filed a grievance after his April 6, 2021, disciplinary hearing, and Pelzer allegedly destroyed his mail on July 1, 2021. The temporal proximity of those actions suggests a causal connection.

The alleged fabrication of a basis to sentence Williams to solitary confinement implicates both Pelzer and Jones. Williams sufficiently alleges his grievances constituted a motivating factor behind Jones's and Pelzer's alleged fabrication of a basis for imposition of solitary confinement. He alleges the imposition of solitary confinement represented Jones and Pelzer's "second act of retaliation" for his grievances. (*Id.* ¶ 163).

41

Moreover, the imposition of solitary confinement occurred soon after the destruction of Williams's legal mail, and Jones and Pelzer allegedly fabricated a basis for imposition of solitary confinement based upon Williams's receipt of mail from his attorney, which provides an additional factual basis for a causal connection.

Williams has sufficiently stated a claim for First Amendment retaliation against Defendants Jones and Pelzer for destroying his legal mail and fabricating a basis to subject him to solitary confinement in retaliation for his grievances. Pursuant to the case law cited previously, both of those actions would evince clearly established violations of the First Amendment. *See Williams*, 64 F.4th at 1193; *Wright*, 795 F.2d at 968. Therefore, qualified immunity does not protect Jones and Pelzer from suit on this claim.

As Williams asserts no facts regarding any other Defendant in connection with this claim, the claim cannot proceed against any other Defendant.

> **(c)** **Williams states a viable claim for First Amendment retaliation based on his open expression and defense of his religious beliefs, and qualified immunity does not protect the named defendants from suit on that claim.**

The First Amendment "doubly protects religious speech": "the Free Exercise Clause protects religious exercises, whether communicative or not, [and] the Free Speech Clause provides overlapping protection for expressive religious activities." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523-24 (2022) (citations omitted). Williams's

expression and defense of his religious beliefs, including by growing his hair and beard, resisting Smith's command to change his religion, and complaining about officers' religious discrimination, constituted protected expression under the First Amendment. *See Williams v. Bedsole*, No. 2:09-CV-375-TMH, 2012 WL 4711856, at *7 (M.D. Ala. Sept. 6, 2012), *report and recommendation adopted sub nom. Williams v. Bedsole*, No. 2:09-CV-0375-TMH, 2012 WL 4711547 (M.D. Ala. Oct. 3, 2012) ("Williams alleges that defendant retaliated against him for expressing his religious beliefs, thus satisfying the first element of his retaliation claim."). Moreover, Williams suffered an adverse action because experiencing a violent attack and the forcible shearing of the hair and beard of a person of ordinary firmness likely would deter such a person from continuing to express their religious beliefs.

As to the causal connection, Williams alleges Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, and Simpson forcibly sheared his hair and beard "in retaliation for Plaintiff's exercise of his religious beliefs and his other protected activities," and Pelzer, "who was supervising on the day in question, continued to retaliate against Plaintiff for all of Plaintiff's acts of protected speech by ordering, enabling, and/or failing to stop the violent assault on Plaintiff." (Doc. 66, ¶ 166). He also asserts Defendants would not have taken such actions "if not for their subjective motivation to target and punish Plaintiff for the above-mentioned protected speech and expressions, as evidenced by, *inter alia*, Limestone's failure to forcibly shear other

43

inmates who elected to wear their hair and/or beards long, including known white supremacists." (*Id.* ¶ 168). He avers all Defendants knew of Williams's religious beliefs and the connection between those beliefs and growing his hair and beard. (*Id.* ¶¶ 98-99). He also alleges Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, and Simpson approached him before the assault to warn him they would cut his hair if he did not consent, suggesting those Defendants' participation in the retaliatory actions. Moreover, that the alleged retaliation consisted of shearing Williams's hair and beard, when growing his hair and beard constituted the protected forms of religious expression, suggests a connection between the religious expression and the retaliatory activity.

For these reasons, Williams has stated a viable claim for First Amendment retaliation against Defendants Pelzer, Jones, Parker, Cottles, C. Allen, F. Allan, Ketteman, Charley, Smith, and Simpson regarding the February 5, 2022, assault and forcible shearing of his hair and beard. Pursuant to the case law cited previously, those actions would represent clearly established violations of the First Amendment. *See Smart*, 93 F.4th at 1289. Therefore, qualified immunity does not protect Pelzer, Jones, Parker, Cottles, C. Allen, F. Allan, Ketteman, Charley, Smith, and Simpson from suit on this claim.

**2.    Count III does not state a viable claim for violation of Williams's Sixth Amendment right to counsel.**

In Count III, Williams alleges Pelzer violated his Sixth Amendment right to counsel when he opened, inspected, and destroyed Williams's legal mail outside Williams's presence. (Doc. 66, ¶ 177). Pelzer "then lied about the legal mail to create a false basis to sentence Plaintiff to further solitary confinement." (*Id.*). Jones allegedly acted in "full cooperation" with Pelzer. (*Id.*).

The Supreme Court has succinctly held that "the Sixth Amendment does not govern civil cases," *Turner v. Rogers*, 564 U.S. 431, 441 (2011), and it has "repeatedly reaffirmed that there is no constitutional right to counsel in state postconviction proceedings." *Shinn v. Ramirez*, 596 U.S. 366, 386 (2022) (citing *Davila v. Davis*, 582 U.S. 521, 528 (2017)). Williams's Third Amended Complaint alleges ADOC has incarcerated him since 2007 for a crime occurring "shortly after his twentieth birthday." (Doc. 66, ¶ 19). His criminal proceedings have concluded, and the attorney who attempted to send Williams mail represented him in post-conviction proceedings. Thus, the legal mail in question related to a civil proceeding, and Pelzer's alleged destruction of it did not implicate the Sixth Amendment.

Williams's invocation of the Fourteenth Amendment does not change the analysis. (*See id.* at 34 ("Count III- Violation of Right to Counsel – Sixth and Fourteenth Amendments, 42 U.S.C. § 1983")). The Fourteenth Amendment acts as a vehicle by

which plaintiffs can assert Sixth Amendment violations against States and State actors; it does not provide an independent cause of action for violations of the right to counsel. *See Ramos v. Louisiana*, 590 U.S. 83, 93 (2020) (citing *Duncan v. Louisiana*, 391 U.S. 145, 148-150 (1968)) ("This Court has long explained that the Sixth Amendment right to a jury trial is 'fundamental to the American scheme of justice' and incorporated against the States under the Fourteenth Amendment.").

As Williams has not stated a viable claim for the violation of a constitutional right, the court need not assess whether the law clearly established the right at the time of the violation. For these reasons, the court will dismiss Count III of Williams's Complaint.

### 3. Count IV states a viable claim for excessive force, and qualified immunity does not protect the named defendants from suit on that claim.

The Eighth Amendment governs a convicted prisoner's claims for excessive force by prison officials. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999) (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010)) ("The Eighth Amendment's proscription of cruel and unusual punishments … governs prison officials' use of force against convicted inmates.").

"The Eighth Amendment, among other things, prohibits 'cruel and unusual punishments.'" *Sconiers v. Lockhart*, 946 F.3d 1256, 1265 (11th Cir. 2020) (citing U.S. Const. amend. VIII). Pursuant to Supreme Court authority, "the unnecessary and

46

wanton infliction of pain" constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).  In assessing an inmate's Eighth Amendment excessive force claim, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 6 (citing *Whitley*, 475 U.S. at 320-21).  "[A] correctional officer's malicious and sadistic actions that both have no legitimate penological purpose and are unacceptable by contemporary standards of decency subject a prisoner to cruel and unusual punishment, in violation of the Eighth Amendment." *Sconiers*, 946 F.3d at 1259 (citing *Wilkins*, 559 U.S. at 37).

The excessive force standard encompasses both subjective and objective inquiries.  Subjectively, the court must assess whether "'the excessive force [was] sadistically and maliciously applied for the very purpose of causing harm.'" *Sconiers*, 946 F.3d at 1265 (citations omitted). Objectively, the court must assess "whether the official's actions were 'harmful enough.'" *Id.* (citations omitted).  "[T]he official must have both 'acted with a sufficiently culpable state of mind' (the subjective element), and the conduct must have been 'objectively harmful enough to establish a constitutional violation.'" *Id.* (quoting *Hudson*, 503 U.S. at 8).

Williams alleges Defendants Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson (the Count IV Defendants) used excessive force when they

> used excessive amounts of pepper spray (specifically, a "riot mace" intended only for outdoor use) in a confined space – Plaintiff's prison cell – such that Plaintiff could not breathe; beat Plaintiff with batons; slammed him into the floor; dragged him shackled along the floor; slammed him into a table; obstructed his breathing; placed their combined weight on him in a variety of pressure holds designed to inflict extreme pain; forcibly sheared his head and his facial hair; left him chained for hours in the cold with inadequate coverings, and denied him medical care.

(Doc. 66, ¶ 180).  Those actions allegedly "inflicted unnecessary and wanton pain and suffering and/or were taken without penological justification." (*Id.* ¶ 181).  As a result, Williams alleges he "has suffered and continues to suffer damages including, without limitation, severe physical injury; pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained." (*Id.* ¶ 182).  Further, Williams alleges the Count IV Defendants "engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial." (*Id.* ¶ 183).

The Count IV Defendants do not challenge whether the alleged actions constitute excessive force under the constitutional standard, and the court finds the alleged conduct clearly does. Rather, Defendants assert Williams's allegations do not state a viable excessive force claim because Williams did not specify which Defendant committed which acts of force. (*See* Doc. 68, at 11 ("Count IV lists eight Defendants

48

that collectively engaged in a variety of activities.  But it is impossible for eight people to cut one person's hair at the same time. . . .   It is also impossible for eight people to spray 'riot mace' into a confined space.")).

The Eleventh Circuit has demonstrably "reject[ed] the argument that the force administered by each defendant in [a] collective beating must be analyzed separately to determine which of the defendants' blows, if any, used excessive force." *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002), *overruled on other grounds by Pearson*, 555 U.S. 223. Otherwise, "all that police officers would have to do to use excessive force on an arrestee without fear of consequence would be to put a bag over the arrestee's head and administer the beating in silence." *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1342 (11th Cir. 2007); *see also Bright v. City of Tampa*, No. 8:18-CV-1123-T-23CPT, 2020 WL 2745814, at *5 (M.D. Fla. May 27, 2020) ("[N]o requirement exists for a plaintiff, whose view arises amid a chaotic episode of excessive force, to identify with specificity the force that each officer applied.").

Moreover, as Williams points out, his Third Amended Complaint specifies which Defendants performed some of the actions he references.  (*See* Doc. 66, ¶¶ 116 ("[A]t least Defendants Charley and Parker. . . pepper-sprayed Mr. Williams in the face . . . ."), 127 ("Defendant Ketteman held Mr. Williams down by the neck, choking him."), 129 ("Defendant Parker repeatedly stomped on the chain that ran between Mr. Williams's

hands and feet, continually contorting and cutting his body."), & 130 ("Defendant Simpson forcibly sheared Mr. Williams's hair and beard.")).

For these reasons, the court finds the allegations of Williams's Third Amended Complaint sufficient to state a viable claim for excessive force violations against the Count IV Defendants.  Moreover, in the Eleventh Circuit, "a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution." *Skrtich*, 280 F.3d at 1301 (citing *Johnson v. Breeden,* 280 F.3d 1308 (11th Cir. 2002), *overruled on other grounds by Wilkins*, 559 U.S. 34).  Accordingly, the Count IV Defendants are not entitled to qualified immunity on Williams's excessive force claim.

The court will deny those Defendants' motion to dismiss Count IV of the Third Amended Complaint.

> **4.    Count VI asserts a viable claim for failure to intervene against Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson, and qualified immunity does not protect those defendants from suit on the claim.  However, Count VI does not state a viable claim for failure to intervene against Pelzer and Hines.**

Williams alleges Defendants Pelzer, Hines, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson (the Count VI Defendants) violated his Eighth Amendment rights by "failing to intervene to stop the use of grossly excessive

force against" him.  (Doc. 66, ¶ 189).  "'An officer who is present at the scene and who

fails to take reasonable steps to protect the victim of another officer's use of excessive

force can be held liable for his nonfeasance.'" *Williams*, 64 F.4th at 1199 (quoting

*Velazquez*, 484 F.3d at 1341).  To state a viable claim against a corrections officer for

failure to intervene, a plaintiff must assert the officer was "(1) in a position to intervene

in an ongoing constitutional violation and (2) failed to do so." *Id.* (citing *Priester v. City

of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000)).[12]

---

[12] Defendants cite *Murphy v. Turpin*, 159 F. App'x 945 (11th Cir. 2005), for the proposition that "[a] claim for failure to intervene requires a showing that a defendant was deliberately indifferent to a substantial risk of harm," and they assert Williams has failed to plausibly plead that claim because he did not allege any facts demonstrating deliberate indifference.  (Doc. 68, at 15).  However, this court does not construe *Murphy* as imposing an additional element for a failure to intervene claim beyond the two set forth in the text.  As an initial matter, the Eleventh Circuit did not publish *Murphy*, so the decision does not bind this court.  *See* 11th Cir. Rule 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Moreover, the circumstances of the *Murphy* decision do not portray deliberate indifference should be an element of a failure-to-intervene claim.  The *pro se* plaintiff in *Murphy* acknowledged a corrections officer intervened to stop an attack on him by another inmate, though he faulted the officer for not intervening more quickly.  *See* Complaint at 7, *Murphy v. Turpin*, No. 2:04-cv-00031-WCO (N.D. Ga. Feb. 6, 2004), ECF No. 1.  The district court assessed the averments that officers "arrived at the cell and told everyone to get back but did not immediately stop the fight" as a failure-to-protect claim, not a failure-to-intervene claim.  *Murphy v. Turpin*, No. 2:04-cv-00031-WCO, slip op. at 3-5 (N.D. Ga. July 29, 2004).  The Eleventh Circuit appears to have considered the officer's failure to timely stop the assault under the umbrella of deliberate indifference, not as an independent claim for failure to intervene.  *Murphy*, 159 F. App'x at 948 ("Liberally construing Murphy's *pro se* complaint, and taking all of its factual allegations as true, Murphy, at a minimum, asserted a facially satisfactory claim for deliberate indifference, sufficient to avoid a § 1915A dismissal, based on Weiler's conduct.  Weiler's alleged failure to intervene, standing by in the face of an inmate disturbance that he observed, particularly one which Murphy alleges resulted in his loss of oxygen and necessitated CPR treatment, *may* constitute deliberate indifference to a substantial risk of serious harm.  Unlike the threat alleged from the failure to protect him from inmate Thomas, the threat alleged as a result of Weiler's failure to intervene after Thomas threatened to kill Murphy, and only after the fight broke out, *may,* if proved, satisfy the subjective element of a deliberate-indifference claim.") (emphasis in original).

Williams alleges Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson allegedly perpetrated excessive force upon Williams, yet none of those officers attempted to intervene to stop the use of force.  Thus, he viably alleges those Defendants were present at the scene of his assault, thereby placing them in a position to intervene, yet they failed to do so.  Defendants re-assert their argument that the claim cannot proceed because "[t]here are no facts showing which Defendant committed which act and no facts showing which defendants were involved in certain stages of the alleged assault."  (Doc. 68, at 16).  But that argument fails for the reasons discussed in Section III(B)(3), *supra*.

Williams also alleges "Pelzer was the supervisor on duty on the day of Plaintiff's violent assault, and was aware of and/or ordered the assault."  (Doc. 66, ¶ 190). However, he does not allege that Pelzer was present at the scene of the assault, that he participated in the assault, or even that he knew exactly when the assault occurred.  In an unpublished opinion, the Eleventh Circuit declined to hold a warden liable for failure to intervene, even though the plaintiff alleged the warden ordered the use of force, because the warden was not physically present during the force incident.  *Williams v. Rickman*, 759 F. App'x 849, 853 (11ᵗʰ Cir. 2019). The court finds that decision persuasive

---

Though the Eleventh Circuit's *Murphy* decision may conflate the standards for failure to intervene and deliberate indifference, more recent, published Eleventh Circuit decisions clearly set forth a two-element test for a failure-to-intervene.  Therefore, the *Murphy* decision does not persuade this court to add deliberate indifference as an additional element to a failure-to-intervene claim.

and consistent with binding Eleventh Circuit authority, discussed above, requiring a defendant's physical presence at the scene before holding the defendant liable for a failure to intervene. *See also Waller v. Kight*, No. 1:21CV196/AW/ZCB, 2023 WL 2245136, at *7 (N.D. Fla. Jan. 24, 2023), *report and recommendation adopted*, No. 1:21-CV-196-AW-ZCB, 2023 WL 2250480 (N.D. Fla. Feb. 27, 2023) ("Given this undisputed evidence that Defendant White was not present when Defendants Kight and Lord used force, he cannot be held liable for failure to intervene."); *Williams v. Dunn*, No. 4:21-CV-00921-MHH-HNJ, 2022 WL 21827901, at *39 (N.D. Ala. July 29, 2022) ("Williams fails to plausibly allege his attack occurred in the Defendants' presence, and thus, that Defendants maintained a position to intervene."). Accordingly, Plaintiff's failure-to-intervene claim against Pelzer cannot proceed.

Finally, Williams alleges Hines "was also present and in fact threatened Plaintiff that he was going to be assaulted by a group of officers." (Doc. 66, ¶ 190). In his brief, Williams clarifies that Hines was "on duty" the night of the assault (Doc. 77, at 36), not that Hines directly participated in or was present at the scene of the assault. Hines's alleged threat to Williams prior to the assault does not establish his presence during the assault. Accordingly, Williams has not asserted a viable claim against Hines for a failure to intervene.

In summary, Williams's failure-to-intervene claim against Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson may proceed. Pursuant to

the precedent and authority cited previously, those Defendants' alleged failure to intervene in an ongoing constitutional violation despite their ability to do so would represent a clearly established violation of the Eighth Amendment. *See Williams*, 64 F.4th at 1199; *see also Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1560 (11ᵗʰ Cir. 1993), *as amended,* 14 F.3d 583 (11ᵗʰ Cir. 1994) ("A police officer has a duty to intervene when another officer uses excessive force."). Accordingly, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson are not entitled to qualified immunity on Williams's excessive force claim.

However, the court will dismiss the failure-to-intervene claims against Pelzer and Hines. As Williams has not stated a viable claim against those Defendants for the violation of a constitutional right, the court need not assess whether the law clearly established the right at the time of the violation.

5. **Count VII asserts a viable claim for deliberate indifference to serious medical needs against Defendants Toney, Streeter, Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, and Smith.**

Williams asserts Defendants Toney, Streeter, Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson (the Count VII Defendants) violated his Eighth Amendment rights by demonstrating deliberate indifference to his serious medical needs. The Eighth Amendment prohibits cruel and unusual punishment and the unnecessary and wanton infliction of pain, which encompasses any

54

deliberate indifference to prisoners' serious medical needs. *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11ᵗʰ Cir. 2020). "'Federal and state governments therefore have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration.'" *Id.* (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11ᵗʰ Cir. 1991)).

"'To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry.'" *Hoffer*, 973 F.3d at 1270 (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11ᵗʰ Cir. 2003)). "To meet the first prong, the plaintiff must demonstrate an 'objectively serious medical need' – i.e., 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention,' and, in either instance, 'one that, if left unattended, poses a substantial risk of serious harm.'" *Id.* (quoting *Farrow*, 320 F.3d at 1243).

"To satisfy the second, subjective prong, the plaintiff must prove that the prison officials 'acted with deliberate indifference to his serious medical need.'" *Id.* (cleaned up) (quoting *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1234 (11ᵗʰ Cir. 2010), *abrogated on other grounds by Randall v. Scott*, 610 F.3d 701 (11ᵗʰ Cir. 2010)). To establish prison officials acted with deliberate indifference, a plaintiff must demonstrate three distinct elements. First, the plaintiff must demonstrate the prison official "had subjective knowledge of a risk of serious harm." *Id.* (internal quotation marks and citation omitted). Second, a

plaintiff must demonstrate the prison official "disregarded that risk." *Id.* (internal quotation marks and citation omitted). Third, a plaintiff must establish the prison official, in disregarding the risk to plaintiff, "acted with 'subjective recklessness as used in the criminal law,'" meaning the prison official "actually knew that his conduct – his own acts or omissions – put the plaintiff at substantial risk of serious harm." *Wade v. McDade*, 106 F. 4th 1251, 1253 (11th Cir. 2024) (en banc) (quoting *Farmer v. Brennan*, 511 U.S. 825, 839 (1994)). "An inmate-plaintiff bears the burden to establish both [the objective and subjective] prongs." *Hoffer*, 973 F.3d at 1270 (citing *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)).

Williams alleged a serious medical need, as he states the officers' use of pepper spray burned him and impaired his eyes and breathing; the officers attacked him with fists and batons and dragged him up a flight of stairs, resulting in bruising and large lacerations; and the officers forced him into painful compliance holds, resulting in impaired breathing, severe muscle strain, and pain. (Doc. 66, ¶ 195; *see also id.* ¶¶ 114-17, 124-29, 135, 141).[13]

Williams also alleges "the Count VII Defendants were aware of the injuries that had been caused to [him] during the February 5, 2022[,] assault," as he "requested to be taken to the infirmary and/or receive other medical assistance several times, during and

---

[13] Defendants' brief in support of their motion to dismiss does not challenge the serious medical need element. (*See* Doc. 68, at 17-18).

after his assault, via in person requests and requests through his counsel." (*Id.* ¶ 194).

> Subjective knowledge of the risk requires that the defendant be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Caldwell v. Warden, FCI Talladega*, 748 F. 3d 1090, 1100 (11th Cir. 2014). "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judged separately and on the basis of what that person kn[ew]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (citation omitted).

*Dang by and through Dang v. Sheriff, Seminole Cnty, Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (alteration in original).

The "Excessive Force Defendants" (Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson) possessed knowledge of Williams's injuries because they inflicted the injuries, observed the obviously serious effects on Williams, and heard Williams's repeated requests for treatment.[14] *See Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); *Wade v. Daniels*, 36 F.4th 1318, 1327 (11th Cir. 2022) ("There is no question that the investigators knew that Wade had been shot in the head

---

[14] *See* Doc. 66, ¶¶ 114, 116-17 (stating "Excessive Force Defendants" generally knew of Williams's exposure to pepper spray), 121 ("Because Mr. Williams had been subjected to pepper spray, the Excessive Force Defendants should have taken him to the infirmary to be decontaminated from the pepper spray. However, the officers refused to take Mr. Williams to the infirmary, preventing him from receiving medical attention or speaking to anyone who might intervene."), 122 ("[T]he Excessive Force Defendants diverted Mr. Williams from the admission to the infirmary"), 126 ("The Excessive Force Defendants had not yet allowed Mr. Williams to undergo a proper pepper spray decontamination . . . ."), 131 ("Mr. Williams told the Excessive Force Defendants 'I can't breathe' and asked the Excessive Force Defendants to stop. They did not."), 145 ("Instead of offering Mr. Williams necessary medical attention, the Excessive Force Defendants shut off the water in Mr. Williams's cell.").

and that a substantial risk of serious harm existed."); *Kelson v. Clark*, 1 F.4th 411, 418-19 (5th Cir. 2021) (defendants possessed knowledge of a substantial risk of serious harm because plaintiff suffered head injuries and complained of head injuries); *Patel v. Lanier Cnty. Georgia*, 969 F.3d 1173, 1190 (11th Cir. 2020) (officer possessed subjective knowledge of risk of serious harm when he personally witnessed the plaintiff's symptoms); *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015) ("Because the risks associated with a gunshot wound are obvious, the evidence that each officer knew Mr. Valderrama had been shot is sufficient to establish that each officer had subjective knowledge of the substantial risk of serious harm to Mr. Valderrama.").

Despite knowing of Williams's serious medical needs, the Excessive Force Defendants "left Mr. Williams in his cell and refused to allow him access to any medical treatment despite his multiple requests."  (Doc. 66, ¶ 136; *see also id.* ¶ 143 ("In the aftermath of the assault, the officers refused Mr. Williams's request for a body chart. They also refused Mr. Williams any medical care despite the numerous lacerations, burns, and bruises he sustained in the assault and the pepper spray still on his body.")). Thus, Williams adequately alleged the Excessive Force Defendants disregarded the risk of serious harm to him.

Supporting the third aspect of the subjective deliberate indifference inquiry, Williams sufficiently alleges the Excessive Force Defendants acted with subjective recklessness.  Those Defendants allegedly exacerbated the effects of the pepper spray

by lacerating Williams's skin (*Id.* ¶¶ 126, 141), held Williams down even after he said he could not breathe (*Id.* ¶ 131), laughed and joked throughout the alleged assault (*Id.* ¶ 132), and shut off the water to Williams's cell to prevent a proper decontamination. (*Id.* ¶ 145). Accordingly, Williams adequately alleged both the objective and subjective aspects of a claim against the Excessive Force Defendants for deliberate indifference to serious medical needs.

In addition, the Third Amended Complaint alleges Simpson "told Mr. Williams he would provide Mr. Williams medical attention if Mr. Williams gave him the handcuffs," but Simpson did not follow through with his promise. (Doc. 66, ¶ 140). That allegation further supports Simpson's awareness of Williams's serious medical need given its use as a bargaining chip. Moreover, Simpson did not follow through with his promise to provide Williams medical attention, thereby supporting a viable allegation he disregarded the risk of serious harm. And Simpson's willingness to use Williams's need for medical treatment as a bargaining chip to obtain Williams's handcuffs presents a viable allegation Simpson acted with subjective recklessness. These allegations further support Williams's claim against Simpson for deliberate indifference to serious medical needs.

As to Defendant Streeter, the Third Amended Complaint avers Streeter "spoke to Mr. Williams in person but continued to deny Mr. Williams a body chart. Other Limestone staff requested to follow protocol and conduct a body chart but Defendant

Streeter said something to the effect of 'we not taking no pictures.'" (*Id.* ¶ 150).[15]  These allegations further buttress the conclusions that Streeter possessed the opportunity to personally view Williams's injuries, which, as stated, resulted in serious medical needs, and he heard Williams's requests for a body chart, yet he did not provide the requested medical care.  Moreover, Streeter's alleged comment about not taking pictures presents a viable allegation Streeter acted with subjective recklessness, as it depicts a possible desire to cover up wrongdoing. *See Myrick v. Fulton Cnty., Georgia*, 69 F.4th 1277, 1298 (11th Cir. 2023) (citing *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007)) (supervisor can be held liable for deliberate indifference when "facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so").  Accordingly, Williams alleges a viable claim against Streeter for deliberate indifference to serious medical needs.

Williams alleges his attorney sent a cease-and-desist letter to Defendants Toney, Pelzer, and Smith, informing those individuals that officers had pepper-sprayed

---

[15] Williams alleges "Captain Caldwell" took away his tablet because he repeatedly requested a body chart, and he informed Caldwell he would persist in a hunger strike until he received a body chart.  (*Id.* ¶¶ 147-49).  However, Williams did not name Caldwell as a Defendant.

The Third Amended Complaint also alleges Parker ordered a nurse to leave Williams's cell after she examined Williams.  (*Id.* ¶ 122).  However, that allegation does not support a claim for deliberate indifference to serious medical needs because the nurse examined Williams.

Williams and requesting Williams receive treatment for any injuries he had received. (Doc. 66, ¶ 142).[16]  As previously discussed, Williams has stated a viable claim against Smith for deliberate indifference to serious medical needs.

As to Toney and Pelzer, Williams's allegations about the cease-and-desist letter could viably support assertions they knew he experienced a serious medical need and suffered a substantial risk of serious harm resulting from his medical condition. However, Williams does not present any specific factual allegations regarding Toney's or Pelzer's disregard of his serious medical need, or any allegations regarding those Defendants' subjective recklessness.  Accordingly, these allegations do not support a viable direct liability claim against Toney or Pelzer for deliberate indifference to serious medical needs.

Williams also alleges that

"[t]hrough their policies and practices described herein, the Count VII Defendants have subjected Plaintiff to a substantial risk of serious harm stemming from his injuries incurred as a result of the use of excessive force against him, and from inadequate mental health treatment stemming from the series of unconstitutional acts carried out against him . . ."

(*Id.* ¶ 196).  Williams presumably invokes the concept of supervisory liability.  As most of the Count VII Defendants served as non-supervisory corrections officers, they do not stand subject to supervisory liability.

---

[16] The cease-and-desist letter also stated Williams's attorney's belief that officers left Williams outside in freezing temperatures, but Williams acknowledges that conduct did not occur.  (*Id.* at 28 n.23).

However, Williams may assert a supervisory liability claim against Toney, Streeter, or Pelzer, all of whom served in a supervisory capacity, as to any viable underlying claim for deliberate indifference to serious medical needs, *see Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)) ("There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation."), and Williams has alleged viable deliberate indifference claims against all other named Defendants.

"'[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.'" *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1047 (11th Cir. 2014) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall*, 610 F.3d 701); *see also Stallworth v. Wilkins*, 802 F. App'x 435, 445 (11th Cir. 2020) (per curiam) ("[S]upervisory officials may not be held vicariously liable under § 1983 for the unconstitutional acts of their subordinates." (citing *Cottone*, 326 F.3d at 1360)). Rather, a plaintiff must allege the "supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Keith*, 749 F.3d at 1047-48; *see also Iqbal*, 556 U.S. at 677 ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Williams does not allege Toney or Pelzer personally displayed deliberate indifference to his serious medical

needs. Thus, he must establish a causal connection between those supervisors' actions or inactions and the subordinate officers' alleged deliberate indifference to serious medical needs.

As discussed, Williams plausibly alleges a claim for Streeter's deliberate indifference to serious medical needs, yet holding Streeter liable pursuant to the supervisory liability standard requires allegations portraying a causal connection between Streeter's alleged actions or inactions and his subordinate officers' alleged deliberate indifference to serious medical needs.

> "The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."

*Keith*, 749 F.3d at 1048 (quoting *Cottone*, 326 F.3d at 1360) (alterations in original). "'The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.'" *Keith*, 749 F.3d at 1048 (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)).

Williams alleges the DOJ reports documented a history of widespread abuse and unconstitutional policies that placed Toney, Streeter, and Pelzer on notice that they

63

needed to take corrective action.  Specifically, the reports documented that Limestone officers, ostensibly including all the Count VII Defendants, frequently deploy pepper spray into prisoners' small, poorly ventilated cells and refuse to decontaminate prisoners or their cell after such deployment.  (Doc. 66-2, at 19; *see also* Doc. 66, ¶¶ 90-91).  The reports also document that "some nurses help correctional officers ensure that injuries caused by uses of force are concealed and not properly documented on body charts," and that "following a use of force, officers sometimes place prisoners in segregation for extended periods, so that any injuries can heal unobserved and undocumented."  (*Id.* at 20).  Williams asserts Toney, Streeter, and Pelzer "were . . . familiar with the DOJ reports."  (*Id.* ¶ 186).[17]

Defendants argue the DOJ reports could not provide them with the requisite notice to support a deliberate indifference claim because the Notice Letter included within the DOJ report states:

> The Department does not serve as a tribunal authorized to make factual findings and legal conclusions binding on, or admissible in, any court, and nothing in this Notice should be construed as such. Consequently, this Notice Letter is not intended to be admissible evidence and does not create any legal rights or obligations.

(Doc. 66-2, at 4).  *See Ray v. Gadson*, No. 2:20-CV-00499-RDP, 2023 WL 7228933, at *6 (N.D. Ala. Nov. 2, 2023) (relying upon that disclaiming language to summarily reject

---

[17] Indeed, DOJ sent a copy of the reports to Toney, in her capacity as Warden of a different facility, as well as to the predecessors in office of Hamm and Streeter.  (Doc. 66-1, at 3-5).

the DOJ report as establishing notice of widespread violations, customs, and policies at the motion to dismiss stage).[18]

The undersigned heeds the unpublished decision of the Sixth Circuit Court of Appeals in *Simpkins v. Boyd Cnty. Fiscal Ct.*, No. 21-5477, 2022 WL 17748619 (6th Cir. Sept. 2, 2022). The Sixth Circuit rejected the district court's summary conclusion that a "DOJ Report's own internal disclaimer rendered it inadmissible," as "[d]isclaiming language does not, by itself, impact a federal court's admissibility analysis." *Id.* at *8. As the report's "disclaimer about admissibility included no explanation of *why* the Report was inadmissible under relevant evidentiary standards, and the district court did not provide additional reasoning[,] [t]he court abused its discretion in concluding that the disclaimer alone rendered the Report inadmissible." *Id.* at *9. The Court concluded "portions of the Report might be admissible to show that [the facility] was on notice of alleged constitutional violations." *Id.* at *12; *see also Stucker v. Louisville Metro Gov't*, No. 23-5214, 2024 WL 2135407, at *12 (6th Cir. May 13, 2024) (Court could take judicial notice of a DOJ report).

---

[18] Another decision within this district questioned whether the court could "properly consider the DOJ Report as evidence" in light of the disclaiming language, the lack of dates and names attributed to violent incidents described in the report, and the report's failure to identify the individual defendant "as an official who was aware of and indifferent to the conditions" at the facility. However, despite expressing those concerns, the court assumed the report could constitute evidence establishing unconstitutional conditions of confinement at the facility, yet nonetheless found there existed no evidence the named defendant recklessly disregarded the threat those conditions imposed. *Walker v. Givens*, No. 22-CV-00258-ACA-SGC, 2022 WL 4395452, at *9 (N.D. Ala. Aug. 26, 2022), *report and recommendation adopted*, No. 22-CV-00258-ACA-SGC, 2022 WL 4391504 (N.D. Ala. Sept. 22, 2022).

This court finds the Sixth Circuit's decision persuasive, as Williams does not rely upon the Notice Letter to provide binding factual findings or legal conclusions, to provide evidence of past instances of excessive force, or to directly impose a legal obligation on Defendants. Rather, Williams asserts the Notice Letter and the report attached to it provided the Count V Defendants with sufficient notice of a pattern of widespread abuse. Other courts have relied on similar reports to establish an official's notice, though they have not addressed the effect of any disclaiming language. *See Guadalupe-Baez v. Pesquera*, 819 F.3d 509, 516-17 (1st Cir. 2016) ("The short of it is that Guadalupe's supervisory liability claim against Pesquera crosses the plausibility threshold because the DOJ has given him a leg up. . . . The existence of the Report put Pesquera on luminously clear notice that he might become liable, in his supervisory capacity, should his acts and omissions contribute to the continuation of the pathologies described in the Report."); *Starr v. Baca*, 652 F.3d 1202, 1209 (9th Cir. 2011) (discussing DOJ findings referenced in complaint as part of the basis for meeting the *Iqbal* threshold for supervisory liability pleading); *Lemay v. Winchester*, 382 F. App'x 698, 703 (10th Cir. 2010) (noting DOJ report that set forth numerous deficiencies in jail medical procedures created fact issue as to supervisory liability; *Hicks-Fields v. Harris County, Texas*, 860 F.3d 803 (5th Cir. 2017) (in *Monell* claim, affirming district court decision to admit DOJ report as evidence of both notice and the existence of a pattern of constitutional violations, stating that "[r]eports of this type may make it at least

marginally more likely that patterns of unconstitutional conduct occurred"); *Totton v. City of Sacramento*, No. 2:20-CV-01152-TLN-KJN, 2022 WL 4387793, at *6 (E.D. Cal. Sept. 22, 2022) ("[A] trier of fact could find that the DOJ Report – which was published in early 2019 before this incident took place – put SPD on notice that their use-of-force policies were deficient, and that training was obviously necessary to avoid constitutional violations."); *Aleman v. Dart*, No. 09-CV-6049, 2010 WL 4876720, at *7 (N.D. Ill. Nov. 23, 2010) (DOJ report finding a jail's medical care fell below constitutional standards conceivably put the institution on notice of constitutional violations).

In addition to notice of unconstitutional conditions from the DOJ reports, Williams also asserts Streeter "receive[s] reports and updates about the aforementioned dangerous conditions at Limestone in the normal course of [his] duties, [and] Defendants Toney and Streeter received Plaintiff's grievances and the urgent cease-and-desist letter from his counsel." (Doc. 66, ¶ 186). Pelzer allegedly knew of the conditions described in the report, and he "was an active participant in perpetuating the unconstitutional conditions at Limestone." (*Id.*).

Based on the preceding discussion, the court finds that, at the pleading stage, Williams plausibly alleged a history of widespread abuse and/or unconstitutional customs and policies placed Toney, Streeter, and Pelzer on notice of the need to correct violations of Limestone inmates' rights to be free from deliberate indifference to serious medical needs. As he also alleged those Defendants failed to take appropriate corrective

action to prevent harm, the court finds he has stated a viable supervisory claim against those Defendants for deliberate indifference to serious medical needs.

In summary, Williams states a viable claim for deliberate indifference to serious medical needs against Defendants Streeter, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson, for their personal involvement in deliberate indifference to serious medical needs, and against Defendants Toney, Streeter, and Pelzer, for supervisory liability as to the other Defendants' acts of deliberate indifference to serious medical needs. Pursuant to the case law cited previously, those Defendants' actions would represent clearly established violations of the Eighth Amendment. *See Farmer*, 511 U.S. at 839; *Hoffer*, 973 F.3d at 1270; *Wade*, 106 F. 4th at 1253. Therefore, qualified immunity does not protect those Defendants from Williams's claim for deliberate indifference to serious medical needs.

> **6.    Count VIII asserts a viable Fourteenth Amendment race discrimination claim against Pelzer and Jones, and qualified immunity does not protect those defendants from suit on that claim.**

Williams alleges Pelzer violated his Fourteenth Amendment right to equal protection by subjecting him to race discrimination when he: (1) told Williams he must be in a gang because he is Black; (2) verbally discriminated against him because he is Black; and (3) charged him with "delaying and hindering," which "he did not do to similarly situated white incarcerated people." He alleges Jones "approved these

disciplinary reports and sentenced Plaintiff to solitary confinement." (Doc. 66, ¶¶ 201-02).

As discussed previously, the applicable statute of limitations bars any equal protection claims based upon interactions between Williams and Pelzer in 2018, including Pelzer's alleged statement about Williams being in a gang, and any other verbal discrimination occurring before June 30, 2021.

To state a viable Fourteenth Amendment equal protection claim based upon the allegedly discriminatory "delaying and hindering" charge, Williams must allege: "(1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." *Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1318-19 (11th Cir. 2006) (citing *Jones v. Ray,* 279 F.3d 944, 946-47 (11th Cir. 2001); *Damiano v. Florida Parole and Prob. Comm'n,* 785 F.2d 929, 932-33 (11th Cir. 1986)).

Williams alleges discrimination based upon race, a constitutionally protected category. Moreover, he pleads sufficient detail about similarly situated comparators who received more favorable treatment. Though Williams's conclusory allegation that Pelzer did not charge similarly situated White incarcerated people with delaying and hindering does not provide much factual detail, Williams also alleges "Pelzer has charged all or nearly all of the Black people he has put in disciplinary segregation with

69

'delaying and hindering' rules violations," while he has "charged none or nearly none of the white people in disciplinary segregation with 'delaying and hindering.'" (Doc. 66, ¶¶ 81-82).[19]  Those allegations state a viable race-based equal protection claim against Pelzer.  Moreover, Williams's allegation that Jones approved and implemented Pelzer's discriminatory charges supports a viable equal protection claim against Jones.

Pursuant to the case law cited previously, those Defendants' actions would represent clearly established violations of the Fourteenth Amendment.  *See Sweet*, 467 F.3d at 1318-19.  Therefore, qualified immunity does not protect those Defendants from Williams's claim for race discrimination.

> **7.    Count IX asserts a viable Fourteenth Amendment religious discrimination claim against Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson, and qualified immunity does not protect those defendants from suit on that claim.**

Williams also alleges Pelzer, Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, and Simpson (the Count IX Defendants) violated his right to equal protection under the Fourteenth Amendment by subjecting him to religious discrimination.   As with the race-based equal protection claim, Williams must allege similarly situated prisoners received more favorable treatment, and the Count IX

---

[19] In addition, as previously noted, the facts surrounding events occurring prior to June 30, 2021, may bear relevance as background evidence of a timely claim, or as evidence of a continuing violation.  *See Morgan,* 536 U.S. at 113; *Wainberg,* 93 F. 4th at 1227-28.

Defendants engaged in invidious religion-based discrimination.  *Sweet*, 467 F.3d at 1318-19.

Williams satisfied those pleading requirements by alleging Smith told him he needed to change his religion, and that the Count IX Defendants forcibly sheared his head and facial hair, both of which were essential to his spiritual beliefs, though they did not subject people of other religions to such treatment.  (Doc. 66, ¶ 206).  He also alleges Limestone officers permitted followers of Odinism, "a Nordic religion often practiced by white supremacists," to grow their hair and beards, further demonstrating discriminatory intent on the basis of religion.  (*Id.* ¶ 100).

Pursuant to the case law cited previously, the Count IX Defendants' actions would represent clearly established violations of the Fourteenth Amendment. *Sweet*, 467 F.3d at 1318-19.  Therefore, qualified immunity does not protect those Defendants from Williams's claim for Fourteenth Amendment religious discrimination.

### 8.    Count X does not assert a viable claim for violations of Williams's procedural due process rights.

Williams asserts Defendants Toney, Streeter, Pelzer, and Jones (the Count X Defendants) violated his right to procedural due process under the Fourteenth Amendment.  "Prisoners may . . . claim the protections of the Due Process Clause" and, therefore, "may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citations omitted).  "In [the Eleventh

71

Circuit], a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003), *abrogated on other grounds by Pearson*, 555 U.S. 223 (citing *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994)).

As the Eleventh Circuit has recognized, "[d]etermining whether one was deprived of liberty presents a unique challenge with prisoners, who are already deprived of their liberty in the ordinary understanding of the word." *Kirby v. Siegelman*, 195 F.3d 1285, 1290 (11th Cir. 1999).

> The Supreme Court has identified two situations in which a prisoner can be further deprived of his liberty such that due process is required. The first is when a change in the prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court. *See Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995); *Vitek v. Jones*, 445 U.S. 480, 492-93, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980) (holding that a prisoner is entitled to due process prior to being transferred to a mental hospital). The second situation is when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S. Ct. at 2300; *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974) (prisoners may not be deprived of statutory "good-time credits" without due process). In the first situation, the liberty interest exists apart from the state; in the second, the liberty interest is created by the state. *Bass*[ *v. Perrin*,], 170 F.3d [1312,] 1318[ 11th Cir. 1999)].

*Kirby*, 195 F.3d at 1290-91.

Williams serves a sentence of life without the possibility of parole. (Doc. 66, ¶

56).   Thus, he does not argue that his time in disciplinary segregation extended his original sentence.   (*See* Doc. 77, at 49 (arguing only that his time in disciplinary segregation imposed an atypical and significant hardship)).   *See Wallace v. Hamrick*, 229 F. App'x 827, 830 (11th Cir. 2007) ("Since Wallace alleges violations of liberty interests connected with his administrative segregation, these interests arise from the second situation" – i.e., the imposition of an atypical and significant hardship, not the extension of an original sentence).

Restriction to solitary confinement or disciplinary segregation for an extended period of time may impose an atypical and significant hardship if it results in significantly different conditions from those experienced by inmates in general population, administrative segregation, or protective custody.   *See Sandin*, 515 U.S. at 486 ("The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody."); *Al-Amin v. Donald*, 165 F. App'x 733, 738 (11th Cir. 2006) ("Confinement to administrative segregation, under conditions substantially similar to those experienced by the general population of the prison, does not implicate liberty interests.").

Williams described the conditions of his solitary confinement as follows:

> Mr. Williams was classified as "close custody," the most restrictive custody level, for nearly all of his time in disciplinary segregation.  During this time, Mr. Williams was confined to a six foot by nine foot cell for an

73

average of approximately 23 hours and 56 minutes per day; could only participate in one educational program; could not exercise without being shackled and having his hands cuffed behind his back; was unable to have his daughters and grandson visit for months at a time; and was deprived of nearly all direct human to human contact.

(Doc. 66, ¶ 53).   However, he does not plead any facts demonstrating how his conditions differed from those experienced by inmates in general population, administrative segregation, or protective custody at Limestone, nor has he even offered a conclusory allegation about such differences.  *See Smith v. Reg'l Dir. of Fla. Dep't of Corr.*, 368 F. App'x 9, 13 (11th Cir. 2010) ("Here, although Smith alleged that he was improperly segregated, he did not allege any facts which could be liberally construed to show that his 15- and 30-day confinements were a major disruption to his environment as compared to placement in the general population."); *Manassa v. Stewart*, No. CV 19-0519-TFM-N, 2020 WL 8254385, at *5 (S.D. Ala. Nov. 23, 2020), *report and recommendation adopted as modified*, No. 1:19-CV-519-TFM-N, 2021 WL 218001 (S.D. Ala. Jan. 21, 2021) (dismissing prisoner's due process claim when his complaint failed to describe differences between his confinement conditions and those in the general population); *Averett v. Alabama*, No. 2:21-CV-00406-LCB-SGC, 2022 WL 18161600, at *4 (N.D. Ala. Dec. 14, 2022), *report and recommendation adopted*, No. 2:21-CV-00406-LCB-SGC, 2023 WL 131108 (N.D. Ala. Jan. 9, 2023) (prisoner did not allege a protectable liberty interest when he asserted "no facts regarding the conditions of his confinement in segregation or the conditions of confinement experienced by the general prison

74

population at Donaldson from which the court could infer the former were a 'dramatic departure' from the latter that 'work[ed] a major disruption in his environment' so as to impose an 'atypical and significant hardship' on the plaintiff in relation to ordinary prison life at Donaldson") (alteration in original); *Craig v. Headley*, No. 2:14-CV-00503-LSC, 2017 WL 4340447, at *14 (N.D. Ala. Sept. 29, 2017) ("Craig has not described the conditions of administrative or disciplinary segregation as compared to the general population conditions at Holman. Therefore, he has failed to establish a state-created liberty interest in freedom from segregation confinement at Holman.").

The court also must consider the length of time Williams spent in disciplinary confinement. *See Delgiudice v. Primus*, 679 F. App'x 944, 947 (11th Cir. 2017) ("Both the period of time and the severity of the hardships must be taken into consideration."). In *Williams v. Fountain*, 77 F.3d 372 (11th Cir. 1996), the Eleventh Circuit assumed the plaintiff suffered a liberty deprivation from spending a full year in solitary confinement. *Id.* at 374 n.3. However, even a three-year term of disciplinary confinement may not implicate a liberty interest when the "confinement has occurred under conditions substantially similar to those experienced by the general population." *Al-Amin*, 165 F. App'x at 738. In the present case, absent any factual allegation that the conditions of Williams's disciplinary confinement differed from those of inmates in administrative segregation or the general population, the length of Williams's sentence in disciplinary segregation, standing alone, does not implicate a liberty interest. *See Morefield v. Smith*,

404 F. App'x 443, 446 (11th Cir. 2010) ("While Morefield's four-year confinement in administrative segregation was lengthy, it did not tip the balance in favor of establishing a liberty interest when weighed against other factors in his case — the conditions of his confinement were generally equivalent to general prison population conditions and the length of his stay in administrative segregation did not extend the length of his sentence.").

Because Williams has not viably pleaded a constitutionally protected liberty interest, the court need not assess whether the Count X Defendants deprived him of constitutionally adequate process, or whether they stand entitled to qualified immunity. The court will dismiss Williams's due process claim against all of the Count X Defendants.

> **9. Counts V and XI, Despite their Designations, Assert Claims for Unconstitutional Conditions. Such Claims May Proceed Against Defendants Hamm, Toney, Streeter, and Pelzer, Yet the Court Will Dismiss the Count XI Claims Against the Other Defendants.**

Williams labeled Count V (which he asserted against Defendants Hamm, Toney, Streeter, and Pelzer) as a failure-to-protect claim (Doc. 66, at 36), and he labeled Count XI (which he asserted against all Defendants) as a claim for deliberate indifference to a serious risk of harm. (*Id.* at 42). However, upon closer evaluation, the court concludes both counts present Eighth Amendment claims for unconstitutional conditions of confinement. *See Rhodes v. Chapman*, 452 U.S. 337, 345-47 (1981) ("The Eighth

Amendment prohibits conditions of confinement that amount to cruel and unusual punishment.").

The Eleventh Circuit characterizes the Eighth Amendment as presenting "three distinct . . . claims . . . available to plaintiff inmates alleging cruel and unusual punishment:" "claims challenging specific conditions of confinement, the excessive use of force, and the deliberate indifference to a prisoner's serious medical needs." *Thomas v. Bryant*, 614 F.3d 1288, 1303-04 (11th Cir. 2010); *see also Coleman v. McGhee*, No. 21-12557, 2022 WL 217578, at *1 (11th Cir. Jan. 25, 2022) (citing *Thomas*, 614 F.3d at 1303-04) ("A prisoner can bring three types of claims under the Eighth Amendment: (1) specific conditions of confinement; (2) excessive use of force; or (3) deliberate indifference to a prisoner's serious medical needs.").[20]

---

[20] Other circuits characterize claims such as deliberate indifference to a prisoner's serious medical needs "as falling within a specific subcategory of conditions of confinement claims, not as a separate and distinct legal theory." *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995). Under such a framework:

> When the condition of confinement at issue relates to a prisoner's medical condition, "a prison official violates the Eighth Amendment by being deliberately indifferent *either* to a prisoner's *existing* serious medical needs *or* to conditions posing a substantial risk of serious *future* harm." *Weaver[ v. Clarke,* 45 F.3d 1253,] 1255 [(8th Cir. 1995)]. Thus, when an inmate . . . alleges deliberate indifference to current existing health problems, instead of his future health, the inmate must prove deliberate indifference to a serious medical need. *See id.* When the inmate asserts that there will be harm to his future health or well-being, the inmate must satisfy the more general conditions of confinement test. *See id.*

*Id.* (emphasis in original). That analysis contrasts with the Eleventh Circuit's characterization of excessive force, conditions of confinement, and deliberate indifference to serious medical needs claims as "distinct." *Thomas*, 614 F.3d at 1303-04.

To state a viable conditions-of-confinement claim under the Eighth Amendment, a plaintiff must plead: "(1) a condition of confinement that inflicted unnecessary pain or suffering" (*i.e.*, was cruel and unusual), "(2) the defendants' 'deliberate indifference' to that condition, and (3) causation." *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993) (citations omitted); *see also Thomas*, 614 F.3d at 1304 (A conditions-of-confinement claim "requires a two-prong showing: an objective showing of a deprivation or injury that is 'sufficiently serious' to constitute a denial of the 'minimal civilized measure of life's necessities' and a subjective showing that the official had a 'sufficiently culpable state of mind.'") (quoting *Farmer*, 511 U.S. at 834).

Williams's allegations invoke such a claim, rather than a typical failure-to-protect claim.  In Count V, Williams alleges Defendants Hamm, Toney, Streeter, and Pelzer (the Count V Defendants) violated his rights under the Eighth and Fourteenth Amendments by "failing to protect [him] from excessive force and torture." (Doc. 66, ¶ 185).  He alleges the DOJ reports documented a "well-established practice of using excessive force and torture against people in solitary confinement . . . who, like Plaintiff, complained about their conditions of confinement or who otherwise advocated for their constitutional rights." (*Id.*).  According to Williams:

> These conditions posed an unreasonable risk of serious injury to [his] future health or safety, as the Count V Defendants knew or should have known that Plaintiff repeatedly advocated for his religious rights and filed grievances related to the manufactured nature of the charges that resulted in his sentence to solitary confinement.

(*Id.*). In his brief, Williams also characterizes Count V as challenging "prison conditions posing a substantial risk of serious harm." (Doc. 77, at 29).

In Count XI, Williams alleges:

> By their policies and practices described herein, the Count XI Defendants have subjected Plaintiff to a substantial risk of serious harm and injury from excessive force in violation of the Eighth and Fourteenth Amendments. The Count XI Defendants are aware of, have witnessed, and/or perpetrated the custom within the ADOC of using excessive force and torture against people in solitary confinement who assert their constitutional rights, including by complaining about the conditions of their confinement. Defendants knew or should have known that there was a substantial risk that this practice would be perpetrated against Plaintiff, based on Plaintiff's status in solitary confinement; his refusal to accept unconstitutional conditions of confinement or religious discrimination and willingness to speak out about racial abuse; and the grievances and cease-and-desist letter he and his counsel submitted to Defendants Toney and Streeter. Defendants failed to take necessary action to remediate these issues and/or directly participated in perpetuating these issues, including by subjecting Plaintiff to extreme excessive force and causing his severe and wholly unprovoked injuries.

(Doc. 66, ¶ 214).

Counts V and XI obviously do not assert deliberate indifference to serious medical needs, and Williams raised that claim in a separate cause of action. Though Williams mentions the use of excessive force in those counts, he challenges not the use of force itself, but Defendants' alleged contributions to the risk that excessive force would occur. Williams directly challenged the alleged use of excessive force in a separate cause of action. Hence, Williams's allegations in Counts V and XI invoke the

Eighth Amendment to address the risk of excessive force as an unconstitutional condition of confinement, as Williams references the risk Defendants' actions and omissions posed to his health and safety before the risk culminated in the alleged assault on February 5, 2022.

As an initial matter, the court must consider the Defendants against whom Williams may viably assert a conditions-of-confinement claim. As discussed, Williams asserts Count V against Defendants Hamm, Toney, Streeter, and Pelzer, all of whom occupied supervisory positions, yet he asserts Count XI against all Defendants, including the Count IV Defendants who allegedly perpetrated the excessive force, and Hines, against whom Williams asserts no other viable claims.[21]

"Although each prison employee owes a duty to the inmates affected by his function, that duty must be measured by the scope of his discretion and the extent of his authority." *Williams v. Bennett*, 689 F.2d 1370, 1388 (11th Cir. 1982). None of Williams's allegations suggest that the non-supervisory Defendants bore the sufficient level of authority to ameliorate the alleged unlawful conditions of confinement. "[A]n individual defendant should be able to demonstrate that he had insufficient authority to correct the constitutional deficiencies in the prison." *Id.* The court cannot hold

---

[21] As discussed previously, Williams asserted only a single claim against Hines, for failure to intervene, and the court has already decided to dismiss that claim. Factually, Williams alleged only that Hines told Williams officers would cause problems for him if he did not cut his hair.

liable "a defendant who was without the authority" to correct the alleged deprivation, as such an individual could not display the "callous indifference" necessary to support the deliberate indifference element of a conditions of confinement claim. *Id.* at 1387-89.

The Third Amended Complaint contains no allegations suggesting Defendants Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, Simpson, and Hines – all of whom served as corrections officers – possessed any authority to correct any constitutional deficiencies in the Limestone facility, other than by altering their own behavior. Accordingly, Count XI cannot proceed against those Defendants.

As to the higher-level Defendants – Hamm, Toney, Streeter, and Pelzer – Williams presses a claim based upon those Defendants' own actions or inactions, not upon their supervisory liability for their subordinates' actions or inactions. As another district court within this circuit has elucidated, the "supervisory-causal-connection framework supplements (*not* supplants) the general rule that officials, whether or not they bear the title of supervisor, may be held liable for their *own* unconstitutional conduct." *Barefield v. Dunn*, 688 F. Supp. 3d 1026, 1065 (M.D. Ala. 2023) (emphasis in original).

> [A]ccording to *Farmer v. Brennan* and its progeny, officials – even if they bear the title of supervisor – *personally* violate the Eighth Amendment by the nature of their *own* conduct if they manifest deliberate indifference to a substantial risk of serious harm, which causes a plaintiff's injuries. 511 U.S. 825, 835-38, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). That is, under

excessive-inmate-violence claims, liability may attach to "supervisor" defendants so long as the *Farmer* standard is met as applied against them because they "personally participated in the unconstitutional conditions of confinement due to the responsibility wielded by such officials for control and maintenance of the facilities." *Ogletree*[ *v. Colbert Cnty., Alabama*, No. 3:18-CV-01218-HNJ, 2021 WL 4477630, at *24 (N.D. Ala. Sept. 30, 2021)].

*Barefield*, 688 F. Supp. 3d at 1065 (emphasis in original). That is, the court must focus on "whether an official – under the nominal title of supervisor or otherwise – personally caused the plaintiff's injuries by acting with deliberate indifference to a substantial risk of serious harm . . . ." *Id.* at 1066 (citing *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014)); *see also Madrid v. Gomez*, 889 F. Supp. 1146, 1251 (N.D. Cal. 1995) ("[W]here defendants, through their deliberate indifference, permit and condone a pattern of excessive force against inmates, they have demonstrated sufficient culpability to incur liability under the Eighth Amendment."). Accordingly, the court will assess whether the Third Amended Complaint viably alleges Hamm, Toney, Streeter, and Pelzer bear liability for their own actions or inactions in controlling and maintaining the Limestone facility.[22]

Williams satisfied the first element of a conditions of confinement claim by identifying a condition that inflicted unnecessary pain or suffering. He alleges he

---

[22] Though the *Barefield* decision addressed excessive inmate-on-inmate violence, the same framework for liability applies to a conditions of confinement claim based on a risk of excessive force. Both claims involve an assessment of the supervisory officials' deliberate indifference to a risk of serious harm.

suffered a risk of excessive force due to his recurring complaints about conditions at the facility, particularly the conditions he faced in solitary confinement, and officers' history of using excessive force and torture on individuals who lodge such complaints. In addition, the DOJ reports documented a general culture of excessive force, the excessive and punitive use of chemical spray, and the lack of accountability for officers who engage in excessive force.  Those conditions manifested as "extreme," and they "present[ed] an 'unreasonable risk of serious damage to [Williams's] future health or safety.'" *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (citations omitted).  As the Supreme Court has instructed, "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (citation omitted); *see also Sconiers*, 946 F.3d at 1259 (actions lacking a legitimate penological purpose violate the Eighth Amendment).

Williams also viably alleged Defendants displayed deliberate indifference to the unnecessary risk of excessive force, and their deliberate indifference led to his injury. As discussed, a prison official displays deliberate indifference if he possesses subjective knowledge of a risk of serious harm, yet disregards that risk while acting with subjective recklessness.  *Hoffer*, 973 F.3d at 1270.  Williams alleged Hamm, Toney, Streeter, and Pelzer knew he faced an unreasonable risk of serious injury to his future health or safety because the DOJ reports documented a pattern of excessive force and torture against individuals in solitary confinement who complained about prison conditions or asserted

their rights, and they also gained knowledge of the pattern via their daily responsibilities (including the review of ADOC documents) and the communications from Williams's attorney. The DOJ reports also documented a "lack of accountability in the ADOC's procedures for reviewing uses of force," including failing to document or adequately investigate uses of force. (Doc. 66, ¶ 30).

To sustain the causation burden, a plaintiff must plausibly allege "two causal links: first, a link between [the prison official's] allegedly deliberately indifferent acts and omissions and the excessive risk of violence; and second, a link between the excessive risk of violence and [their] injur[ies]." *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1584 (11th Cir. 1995) (citing *LaMarca*, 995 F.2d at 1538).

> If a plaintiff establishes a causal link between the defendant's acts or omissions and the infirm condition, the defendant is precluded from contending that the unconstitutional condition was not at least a proximate cause of . . . injuries that arose from that condition. This is not to say that a plaintiff need not show a causal link between the constitutionally infirm condition and the alleged injuries. Rather, the finding that a prison condition offends the Eighth Amendment presupposes the distinct likelihood that the harm threatened will result. The wrong in Eighth Amendment cases is the deliberate indifference to a constitutionally infirm condition; that wrong must, in turn, have been the proximate cause of the plaintiffs' injuries, here the injuries brought about by the assaults.

*Hale*, 530 F.3d at 1584 (quoting *LaMarca*, 995 F.2d at 1538).

The Complaint adequately addresses causation because it sufficiently portrays the remaining Defendants' responsibilities and authority over conditions at the facility.

84

Williams alleges those Defendants knew he often advocated for his rights and filed grievances about his disciplinary history, yet "took no steps to remediate these unconstitutional practices,". (Doc. 66, ¶ 187; *see also id.* ¶ 214). Thus, Williams successfully establishes a link between their alleged deliberately indifferent acts and omissions, and the excessive force risk.

Furthermore, clearly established Eleventh Circuit case law placed the pertinent Defendants on notice that their alleged conduct violated the Eighth Amendment as delineated in the *Mathews* decision:

> Crosby argues that even if Mathews can establish a constitutional violation, Crosby is protected by qualified immunity because Mathews has failed to show that it was clearly established at the time of the beatings that a warden could face liability under § 1983 predicated on his failure to take reasonable steps in the face of a history of widespread abuse or his adoption of custom or policies which resulted in deliberate indifference. We disagree. By 1999, it was clearly established that a warden, the person charged with directing the governance, discipline, and policy of the prison and enforcing its orders, rules, and regulations would bear such liability. *See, e.g., LaMarca v. Turner,* 995 F.2d 1526, 1539 (11th Cir. 1993) (holding that prison warden could face liability when his failure to take appropriate measures to improve prisoner safety created a climate that preordained the ensuing violence); *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1443 (11th Cir. 1985) (holding that safety director whose responsibility included disciplining police officers and setting police department policy could be liable for failing to take corrective steps in the face of a pattern of excessive force engaged in by officers); *see also Skrtich,* 280 F.3d at 1303 (stating that by 1998 "precedent clearly established that government officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated"); *Bruce v. Wade,* 537 F.2d 850, 853 (5th Cir. 1976)[23] (a

---

[23] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit

> violation of § 1983 is clearly stated by the unjustified beating of an inmate
> at the hands of prison officials).

*Mathews*, 480 F.3d at 1275-76; *see also Goebert*, 510 F.3d at 1332 (citations omitted) (an official may incur liability for a pattern of excessive force based upon "actual or constructive notice of a flagrant, persistent pattern of violations"); *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003) (an official may incur liability if he "directed [his] subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so"); *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1397-98 (11th Cir. 1994) (an official may incur liability if he failed to train subordinates "when the need for more or different training is obvious, . . . such as when there exists a history of abuse by subordinates that has put the supervisor on notice of the need for corrective measures, . . . and when the failure to train is likely to result in the violation of a constitutional right . . . ."); *Ray*, 2023 WL 7228933, at *6-7 (viable claims stated against supervisory defendants when the complaint alleged the defendants "routinely approved incidents of excessive force, failed to report incidents of force to I&I, [and] refused to take disciplinary action against officers who used excessive force"); *Madrid*, 889 F. Supp. at 1251 ("[W]here defendants, through their deliberate indifference, permit and condone a pattern of excessive force against inmates, they have demonstrated sufficient

---

adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

culpability to incur liability under the Eighth Amendment.").[24]

Such liability may result at all levels of the supervisory hierarchy. *See Mathews*, 480 F.3d at 1275-76 ("[A] warden, the person charged with directing the governance, discipline, and policy of the prison and enforcing its orders, rules, and regulations," may bear liability.); *Ray*, 2023 WL 7228933, at *1 n.3, *2, *3 n.4, *6-7 (complaint asserted viable claims against the ADOC Commissioner, an unspecified "ADOC official," a

---

[24] Some of these decisions apply the supervisory liability standard, rather than assessing a supervisory official's personal liability for deliberate indifference. However, as this court has stated in a prior opinion,

> the supervisory liability causal connection framework occupies common ground with the *Farmer v. Brennan* deliberate indifference analysis. The supervisory liability standard assesses whether a supervisor failed to correct deprivations despite knowledge of a history of widespread abuse. If a plaintiff achieved that showing, he also could likely demonstrate that the official disregarded a substantial risk of serious harm. The supervisory liability framework alternatively assesses whether a supervisor's custom or policy results in deliberate indifference to constitutional rights, leading to even more direct overlap with the *Farmer* standard.

*Ogletree v. Colbert Cnty., Alabama*, No. 3:18-CV-01218-HNJ, 2021 WL 4477630, at *25 (N.D. Ala. Sept. 30, 2021). *See also Barefield v. Dunn*, 688 F. Supp. 3d 1026, 1066 (M.D. Ala. 2023):

> [T]he deliberate-indifference standard, when applied to excessive-inmate-violence conditions of confinement cases (as systemic deficiencies cases), inherently shares common ground with the supervisory liability for subordinate action causation framework. For example, the supervisory liability standard assesses whether a supervisor failed to correct deprivations despite knowledge of a history of widespread abuse, which, if met, would likely mean that a supervisor acted with deliberate indifference to a substantial risk of serious harm from conditions of confinement that systematically create an excessive risk of inmate violence. Likewise, an official can act with deliberate indifference by adopting policies or customs that disregard substantial risks of serious harm, which further overlaps with the supervisory liability test. In short, there is a difference between personal liability for excessive-inmate-violence claims (whether the person has the title of supervisor or not) and supervisory liability; but the difference may not mean much in practice here because of the overlap between the tests in the excessive-inmate-violence context.

warden, and corrections captains); *Jenkins v. Jones*, No. 3:14-CV-1503-J-39MCR, 2017 WL 3381713, at *2, *7 (M.D. Fla. Aug. 7, 2017) (complaint asserted viable claims against a warden and the Secretary of the Florida Department of Corrections).

Williams's Third Amended Complaint asserts sufficient facts to support a viable claim for unconstitutional conditions against Hamm, Toney, Streeter, and Pelzer in Counts V and XI, as he alleges each of those Defendants knew of an unreasonable risk of serious harm from excessive force yet failed to address the risk. As Williams's allegations present violations of clearly established law, qualified immunity does not protect Hamm, Toney, Streeter, and Pelzer at this stage of the proceedings.[25]

In summary, Count V may proceed against Defendants Hamm, Toney, Streeter, and Pelzer. The court will dismiss Count XI against Defendants Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, Simpson, and Hines. Count XI may proceed against Defendants Hamm, Toney, Streeter, and Pelzer.

## CONCLUSION

In accordance with the foregoing results, the court will partially grant and partially deny Defendants' motion to dismiss Williams's Third Amended Complaint.

Count I, for First Amendment retaliation, may proceed, but not as to any

---

[25] Of course, to survive an assertion of qualified immunity at the summary judgment stage, Williams will need to offer sufficient proof of each Defendant's awareness of the risk of harm from excessive force, each Defendant's ability to address the problem, and each Defendant's failure to do so with a sufficient level of culpability.

allegations related to Williams's December 2018 complaints of racism.

The court will dismiss Count II, for RLUIPA violations.

The court will dismiss Count III, for violation of the Sixth and Fourteenth Amendment right to counsel.

Count IV, for excessive force in violation of the Eighth and Fourteenth Amendments, may proceed.

Count V, for unconstitutional conditions of confinement in violation of the Eighth and Fourteenth Amendments, may proceed.

The court will dismiss Count VI, for failure to intervene in violation of the Eighth and Fourteenth Amendments, against Defendants Pelzer and Hines, but the claim may proceed against all other named Defendants.

Count VII, for deliberate indifference to a serious medical need in violation of the Eighth and Fourteenth Amendments, may proceed.

Count VIII, for race discrimination in violation of the Fourteenth Amendment, may proceed.

Count IX, for religious discrimination in violation of the Fourteenth Amendment, may proceed.

The court will dismiss Count X, for Fourteenth Amendment procedural due process violations.

The court will dismiss Count XI, for unconstitutional conditions of confinement

89

in violation of the Eighth and Fourteenth Amendments against Defendants Jones, Parker, Cottles, C. Allen, F. Allen, Ketteman, Charley, Smith, Simpson, and Hines. Count XI may proceed against Defendants Hamm, Toney, Streeter, and Pelzer.

As to any remaining claims against Defendants Charley, Streeter, and Hamm in their official capacities, Williams may receive only prospective injunctive and declaratory relief.

The court will enter an appropriate order contemporaneously herewith.

**DONE** this 13th day of December, 2024.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE